IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

       -v-                                     14-CR-164

ARI ELIAS BAUM,

                   Defendant.
_____

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## OMNIBUS PRE-TRIAL MOTIONS

The United States of America, through its attorneys, William J. Hochul, Jr., United

States Attorney for the Western District of New York, and Frank T. Pimentel, Assistant

United States Attorney, of counsel, hereby files its response to defendant's pre-trial omnibus

motions (Docket Entry ("DE") 38).

## I.   FACTUAL BACKGROUND

In April 2013, the Federal Bureau of Investigation ("FBI") learned that the defendant

was outside of the United States.   (DE 1.)   This was a problem because the defendant was

continuing to collect Supplemental Security ("SSI") benefits, not having reported that he had

been outside the United States for a period exceeding a calendar month and 30 consecutive

days to the Social Security Administration ("SSA"), despite knowing that the law required

him to report this information.   In August 2013, the defendant returned to the United States.

(DE 1.)   The FBI, however, had developed concerns about possible ties to terrorism that it

seemed the defendant might have.   Accordingly, on November 21, 2013, FBI Special Agent

Randall E. Garver applied for and obtained a search warrant from the Honorable H. Kenneth Schroeder, Jr., for the defendant's Facebook account.   (See DE 38-1 at 1-32.)

On December 19, 2013, the defendant completed an SSI benefits redetermination over the phone.   During the interview, he stated that since March 1, 2013, he had not been outside the United States for a calendar month or 30 consecutive days.  (DE 1.)   As described above, this was not true.

On January 1, 2014, the defendant again left the United States.   (DE 1.)   A Criminal Complaint was filed and an Arrest Warrant issued on March 31, 2014, concerning the defendant's December 19, 2013 statements to the SSA.  (DE 1, 8.)   On May 12, 2014, having learned that a warrant had been issued for his arrest, the defendant flew from Morocco, to Germany, and ultimately to Toronto, Canada, from where he drove with his father to the Peace Bridge Port of Entry, seeking entry to the United States on May 13, 2014. (DE 38-1 at 33.)

In September 2014, the defendant was charged in a four-count Indictment.   (DE 16.) Counts 1, 2, and 4 revolve around false statements that the defendant made on December 19, 2013, both affirmatively and by way of non-disclosure of required information, concerning his continued eligibility for Supplemental Security Income ("SSI") benefits.   Specifically, Count 1 alleges a violation of 42 U.S.C. § 1383a(a)(2), making a false statement for use in determining SSI benefits; Count 2 alleges a violation of 42 U.S.C. § 1383a(a)(3), SSI benefits fraud; and Count 4 alleges a violation of 18 U.S.C. § 1001(a)(2), making a material false statement in a matter within the jurisdiction of the executive branch of the United States Government.   Count 3 alleges theft of Government property, SSI benefits, between April 21, 2013, and on or about August 13, 2013, in violation of 18 U.S.C. § 641.

The defendant has now filed omnibus motions seeking (1) suppression of evidence from the November 21, 2013 Facebook search warrant; (2) suppression of statements the defendant made during an immigration inspection on May 13, 2014, at the Peace Bridge Port of Entry in conjunction with his return to the United States; (3) dismissal of Counts 2 and 4 of the Indictment; (4) discovery and inspection; (5) a bill of particulars; (6) Brady material; (7) disclosure of Rule 404(b), 608, and 609 evidence; (8) disclosure of witness statements; (9) preservation of rough notes; and (10) further relief.

The government will respond to these motions *seriatim*.

## II.  ARGUMENT

### A.    The Motion to Suppress Facebook Evidence Should Be Denied

### 1.    The Search Warrant Was Supported by Probable Cause and Not Overbroad

The defendant argues that the search warrant was not supported by probable cause and was overbroad.   (DE 38 ¶ 3.)   This is not so.

The Second Circuit has explained that one who argues that a warrant was issued on less than probable cause

> faces a heavy burden.   "Where [the] circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. . . .   [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.   In particular, where the officer requesting the search warrant relies on an informant, the magistrate's role is to examine the totality of the circumstances and to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.   And the duty of a reviewing court is simply to ensure that the

magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991) (citations omitted).   The Garver affidavit easily satisfies this "practical, commonsense" standard.

Probable cause for a search warrant exists where the totality of the circumstances, viewed practically and with common sense, indicates "a fair probability that contraband or evidence of a crime will be found" in the place to be searched.   Illinois v. Gates, 462 U.S. 213, 238 (1983); see Florida v. Harris, 133 S. Ct. 1050, 1055 (2013).   It "does not demand the certainty we associate with formal trials."   Id. at 246.   Rather, "Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004) (citation omitted).   In this respect, "a face-to-face informant must be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false."   Id. (internal punctuation and citation omitted).

In the present case, at the outset of his affidavit, Special Agent Garver explained that Sources 1-4 had each provided truthful, corroborated information that was reliable and credible.   (See DE 38-1 ¶¶ 4-6.)   In painstaking detail, he then set forth one detail after another explaining why the FBI was concerned that the defendant may be providing material support to terrorists:

- On April 23, 2011, the defendant received a text message saying in relevant part, "I heard you are being trained for being used as a terrorist."   (DE 38-1 ¶ 26.)

4

- On May 1, 2011, within hours of the announcement that Usama bin Laden had been killed, Fremont, California police responded to a restaurant after the defendant, dressed in traditional Muslim dress, asked to leave a panel truck, which was registered to a terrorism case subject, parked in the restaurant parking lot for the night.  (DE 38-1 ¶ 23.)

- On February 28, 2013, the defendant expressed his "willingness to die for a cause he believed in, as there is no greater glory to Allah," and that "death is a gift," to Sources 1 and 2.   (DE 38-1 ¶¶ 27, 29.)

- On February 28, 2013, the defendant told Sources 1 and 2 that the Nazi party's dominance of German politics in the 1930s and 1940s is similar to the U.S. Government's current use of psycho-therapy drugs to control the American populace. The defendant told them that he had recently returned from Syria.   (DE 38-1 ¶ 28.)

- On April 10, 2013, Source 3 informed SA Garver that the defendant was currently in Morocco; that the defendant had lived in Yemen for a year and had traveled to Syria for a few months.   Source 3 also explained that the defendant had attempted to return to Yemen but that his travel was denied.   Source 3 further explained that the defendant had a mental illness diagnose but had not taken his medication in years and that he was "fixated" on converting family and friends to Islam.   (DE 38-1 ¶ 30.)

- On June 27, 2013, Source 4 told SA Garver that Source 4 was Facebook "friends" with the defendant and that Source 4 had noticed that the defendant's posts had become more "extreme, aggressive, and concerning."  Source 4 thought that the defendant could be a danger, a threat to national security.  Source 4 also explained that the defendant and Source 4 had engaged in a Facebook exchange in which the defendant ultimately replied "careful of your tongue, denier," to Source 4, which Source 4 interpreted as a reference to "denial" of Islam.  (DE 38-1 ¶ 31.)

- On July 19, 2013, the defendant – whose Facebook page at the time was open to the public – shared a photo of a man sitting at a table holding an AK-47 speaking to a woman.  The two were wearing military attire with three persons behind them wearing black robes and carrying rifles.  The photo was captioned, "husband and wife fighting for islam!!," with the defendant adding the descriptive comment, "the most beautiful photos I have ever seen!!!"  (DE 38-1 ¶ 34.)

- On the following 2013 dates, the defendant listed the following locations of his travel on Facebook:
  
  May 9 and 12 – Morocco

  May 27, 29, and 31 – Egypt

  June 14, 21, 23, 27, July 8, 10 – Turkey

  July 13, 15, 17, 18, 20, 22, 25, August 3 – United Arab Emirates

- On August 12, 2013, Source 4 informed the FBI that the defendant was attempting to return to the United States but that he was still in France because he was on the no-fly

list.   Source 4 added that the defendant's Facebook status described himself as "too dangerous to fly."   (DE 38-1 ¶ 33.)

- On August 13, 2013, the defendant returned to the United States at JFK Airport and, during his immigration inspection interview, first said that he had left the United States in March 2013 to study in Morocco but later backtracked and said that he had not studied in Morocco.   He also stated that he had wanted to travel to Yemen but could not "get in."   He confirmed that on August 4 he had learned that he was on the "no fly" list.   (DE 38-1 ¶ 36.)

- In September 2013, the FBI learned that the defendant had a Facebook "friend" known as "Sniper from Yabroud (Abu Malik)."   They ascertained that Yabroud is a town in Syria.   This person listed his work and education as, among other things, "Jihad for the cause of God."   The individual also "liked" the Islamic State of Iraq and Levant (*i.e.* ISIL).   (DE 38-1 ¶ ¶ 37-39.)

- In mid-September 2013, the defendant abruptly restricted the content on his Facebook page.   (DE 38-1 ¶ 47.)

Based on the foregoing, the FBI understandably believed it was compelled "to assess whether or not BAUM is providing Material Support to Terrorists in violation of 18 U.S.C. § 2339(A)."   (DE 38-1 ¶ 47.)   Accordingly, SA Garver sought and obtained the search warrant for the defendant's Facebook account.   It is inconceivable that any neutral and detached magistrate would have rejected the application on these facts.   In other words, the

information, taken in its totality as of November 21, 2013, comfortably established probable cause to search Baum's Facebook account.   Any parsing of the application to argue that something less than complete access to the Facebook account was all that was justified is exactly the type of hypertechnical, rather than commonsense, argument that <u>Rivera</u> eschews.

**2.     Regardless of Probable Cause, the FBI Reasonably Relied on the Search Warrant**

"When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant."   <u>Herring v. United States</u>, 555 U.S. 135, 142 (2009) (quoting <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984)). Such reliance is not objectively reasonable most often "when affidavits are bare bones, *i.e.*, totally devoid of factual circumstances to support conclusory allegations."   <u>United States v. Clark</u>, 638 F.3d 89, 103 (2d Cir. 2011).   On the other hand, if "'thoughtful and competent judges' might disagree as to whether the facts alleged established probable cause," then the good-faith exception should apply to prevent suppression.   <u>Id.</u> at 104 (quoting <u>Leon</u>, 468 U.S. at 926).

For the same reasons already provided with respect to probable cause, even if this Court were to disagree with Magistrate Judge Schroeder's probable cause determination, there cannot be any question that "thoughtful and competent judges" might believe that the allegations in the supporting affidavit were sufficient to demonstrate probable cause.   <u>Id.</u> at 104 (quoting <u>Leon</u>, 468 U.S. at 926).   Accordingly, regardless of this Court's probable cause determination, it was objectively reasonable for the agents who executed the search warrant

to rely on it, and the good-faith exception should therefore apply to prevent suppression of the resulting evidence.[1]

**B.   Baum's May 13, 2014 Statements at the Peace Bridge Are Admissible**

The defendant argues that the immigration inspection interview of the defendant on his re-entry to the United States at the Peace Bridge on May 13, 2014, violated the defendant's Fifth and Sixth Amendment rights in that, with the underlying Criminal Complaint having already been filed, <u>Miranda</u> warnings were not administered prior to the interview and the defendant already had counsel, namely, present defense counsel, Brian Comerford.   Under scrutiny, neither argument succeeds.

With respect to the Fifth Amendment argument, that <u>Miranda</u> warnings were required but not given, it is undisputed that warnings were not given.   Accordingly, the question is whether warnings were required.   They were not.

An interaction between law enforcement officers and a person requires prophylactic <u>Miranda</u> warnings when the interaction becomes a "custodial interrogation."   <u>United States v. FNU LNU, a/k/a Sandra Calzada</u>, 653 F.3d 144, 148 (2d Cir. 2011).   That is, there must be an "interrogation" that occurs "in custody."   <u>Id.</u>   Here, the May 14, 2014 Memorandum from Supervisory Customs and Border Protection ("CBP") Officer Ulrich attached to the defendant's motions (DE 38-1 at 33) ("Ulrich Memo") makes clear that an "interrogation"

---

[1] In the event that the Court were to conclude that the search warrant was not supported by probable cause and that reliance on the search warrant was not reasonable, then the government would request an opportunity to brief other potential bases for admissibility of the evidence obtained as a result of the search warrant   For example, the Facebook evidence would have been inevitably discovered because, at the time the search warrant was issued, law enforcement officers manifestly had probable cause to obtain the warrant based on investigation into Baum's being outside of the country while continuing to collect SSI benefits.

occurred for Fifth Amendment purposes.   Accordingly, the question that remains concerning the Fifth Amendment/<u>Miranda</u> claim is whether Baum was "in custody" while being questioned during his immigration inspection.

In <u>FNU LNU</u>, the defendant ("Calzada") arrived at JFK Airport from the Dominican Republic.   In preparing to process the arriving passengers, a CBP officer discovered that "Calzada"'s name, with date and place of birth matching the date and place of birth on the passport she was holding on arrival, appeared on a New York Police Department arrest warrant.   Thus, on arrival, an armed guard escorted her to the secondary inspection room, from which she was not free to leave, and the CBP officer then interrogated her.   653 F.3d at 146.   The Second Circuit held that the defendant was not in custody within the meaning of <u>Miranda</u> during this interrogation.   The court explained that "the test for when <u>Miranda</u> warnings are mandated is objective . . . .   It depends on how a reasonable person in the suspect's position would view the situation."   <u>Id.</u> at 151.   Following from this, the court reasoned that because "one expects both constraints and questions" on arrival at the United States border, it "reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest."   <u>Id.</u> at 154.   The court added that "crucially, a reasonable person would recognize" all of the CBP officer's "questions as relevant to her admissibility to the United States.   Such a person would consider them par for the course of entering the country from abroad."   <u>Id.</u> at 155.   Therefore, "a reasonable person in the defendant's position would not have considered what occurred to be the equivalent of a formal arrest.   It follows that the defendant was not in 'custody' and that, for this reason alone, <u>Miranda</u> warnings were not required."   <u>Id.</u>

The same reasoning applies foursquare in the present case.   It is evident from the Ulrich Memo that the "border inspection" interview consisted of routine questions asked at United States ports of entry.   In relevant portion, the Ulrich Memo states that Baum explained when his current trip out of the country began, where he went while he was out of the country, and how long he stayed in various locations.   There is nothing extraordinary about these sorts of questions during a border inspection.   As a result, per FNU LNU, Baum was not "in custody" for Miranda purposes, and his answers should not be suppressed on that basis.

As to the Sixth Amendment, the defendant's argument is that Mr. Comerford "began representing Mr. Baum concerning this matter" on April 12, 2014, and, therefore, questioning Baum on May 13, 2014, without Miranda warnings and without contacting Mr. Comerford, violated Baum's Sixth Amendment right to counsel.   The shortcoming in this argument is that Mr. Comerford, an attorney with the Federal Public Defender's office, had not yet been appointed by the Court to represent Baum, meaning that under the District Court's Criminal Justice Act Plan ("CJA Plan"), Mr. Comerford was not yet Baum's attorney.

In relevant part, the CJA Plan states that the "determination of eligibility for representation under the CJA *is a judicial function to be performed by the Court* after making appropriate inquiries concerning the person's financial condition."   CJA Plan, § X(K) (June 18, 2010) (emphasis added).   That did not occur here until Baum made his initial appearance on the Criminal Complaint, which occurred later on May 13, 2014, at which time the Court made financial inquiry and appointed Mr. Comerford.   (See DE 3 ("Defendant requests court appointed attorney.   Defendant sworn, examined and determined eligible.   Brian P.

11

Comerford, AFPD appointed.").)   Thus, at the time Baum was questioned during his immigration inspection, Mr. Comerford was not Baum's attorney.   Accordingly, Baum's Sixth Amendment right to counsel was not violated.

## C.   Counts 2 and 4 Should Not Be Dismissed as Multiplicitous

Baum argues that Counts 2 and 4 are multiplicitous of Count 1 and should, therefore, be dismissed.   His only authority for this proposition is an unreported district court case from the Middle District of Tennessee, and there – as the defendant concedes – the court denied the defendant's motion to dismiss for multiplicity.   As a result, it is impossible to ascertain what authority the defendant relies on to seek pretrial dismissal.

In any event, the Second Circuit settled this precise issue in United States v. Josephberg, 459 F.3d 350, 355 (2d Cir. 2006), which is worth quoting at length:

> Where there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed. It is well established that "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion," and "a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution . . . ." (1979). Where two statutory sections operate independently of one another, "there is no bar to the Government's proceeding with prosecution simultaneously under the two statutes." Ball v. United States, 470 U.S. 856, 860 (1985); see Batchelder, 442 U.S. at 118.   In such circumstances, "the Double Jeopardy Clause imposes no prohibition to simultaneous prosecutions." Ball, 470 U.S. at 860 n.7. Even where the Double Jeopardy Clause would bar cumulative punishment for more than one such offense, "the Clause does not prohibit the State from prosecuting [the defendant] for such multiple offenses in a single prosecution." Ohio v. Johnson, 467 U.S. 493, 500 (1984); see, e.g., Ball, 470 U.S. at 860 n.8 ("'there can be no impropriety . . . for a prosecutor to file an information containing counts charging violations of several different provisions of the federal bank robbery statute where there is evidence to support the charges, even though the defendant could not in the end stand convicted of both offenses" (quoting United States v. Gaddis, 424 U.S. 544, 550 (1976))).

Accordingly, "[i]f, upon the trial, the district judge is satisfied that there is sufficient proof to go to the jury on both counts, he should instruct the jury as to the elements of each offense." Ball, 470 U.S. at 865. If the jury convicts on no more than one of the multiplicitous counts, there has been no violation of the defendant's right to be free from double jeopardy, for he will suffer no more than one punishment. If the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts. See id. ("Should the jury return guilty verdicts for each count, . . . the district judge should enter judgment on only one of the statutory offenses."). Or, if judgment of conviction has been entered on more than one such count, the district court should vacate the conviction on all but one. See id. ("remand[ing] with instructions to have the District Court exercise its discretion to vacate one of the convictions").

Given these principles, we conclude that the district court's dismissal of Count 16 prior to trial was at best premature.

Based on the foregoing, the defendant's pretrial motion based on multiplicity must be denied.

### D.    The Motion for Further Discovery and Inspection Should Be Denied

In Federal Court, "pre-trial discovery in criminal cases is strictly circumscribed." United States v. Nelson, 606 F. Supp. 1378, 1389 (S.D.N.Y. 1985).  The limits of such discovery are delineated in Federal Rule of Criminal Procedure 16, "which by its terms governs discovery in criminal cases."   United States v. Armstrong, 517 U.S. 456, 461 (1996).

Rule 16(a)(1) provides, in relevant part, that the government must disclose:

(A)    Defendant's Oral Statement . . . if the government intends to use the statement at trial.
(B)    Defendant's Written or Recorded Statement
(D)    Defendant's Prior Record
(E)    Documents and Objects
(F)    Reports of Examinations and Tests [and]
(G)    Expert Testimony.

Rule 16 specifically excludes certain items from discovery.   According to Rule 16(a)(2) and (a)(3), information not subject to disclosure or inspection includes "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case;" . . . "statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500;" and "discovery or inspection of a grand jury's recorded proceedings, except as provided in Rules 6, 12(h), 16(a)(1), and 26.2."

In the instant case, the government has provided more than all discovery required at this time under Rule 16, which will be supplemented with <u>Jencks</u> Act material, to the extent not already provided, including grand jury transcripts, as required by the District Court's pretrial order.   Pursuant to the defendant's request for notice of intent pursuant to Federal Rule of Criminal Procedure 12(b)(4)(B), the defendant is hereby notified that the government intends to introduce in its case-in-chief at trial all of the evidence and documents previously disclosed to the defendant.   Otherwise, the government is aware of its obligation to provide continuing Rule 16 discovery if and when such becomes known to the government, and agrees to comply with this requirement.

**E.      The Motion for a Bill of Particulars Should Be Denied**

The defendant seeks particularization regarding "the alleged false statement or misrepresentation made by Mr. Baum to SSA on December 19, 2013."   The defendant argues that the discovery "does not state exactly what Mr. Baum was asked, and what he allegedly said or did not say."   The request should be denied.

14

### 1.     The Legal Standard for a Bill of Particulars

Federal Rule of Criminal Procedure 7(f) authorizes the Court to direct a bill of particulars only in certain limited circumstances.   According to settled law, a defendant in a criminal case may only obtain a bill of particulars if the facts are "necessary to apprise the defendants of the charges against him [or her] with sufficient precision so as:   (i) to enable him [or her] to prepare his defense; (ii) to avoid unfair surprise at trial; and (iii) to preclude a second prosecution for the same offense."[2]   United States v. Persico, 621 F. Supp. 842, 868 (S.D.N.Y. 1985) (citing Wong Tai v. United States, 273 U.S. 77, 82 (1927)); United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987).   Thus, courts have uniformly denied particularization when the information sought is contained in the indictment or when extensive discovery has been afforded to the defendant.   United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990); United States v. Payden, 613 F. Supp. 800, 817 (S.D.N.Y.), aff'd, 768 F.2d 487 (2d Cir. 1985); see also United States v. Desantis, 802 F. Supp. 794, 797-798 (E.D.N.Y. 1992) ("As a general rule if the information that the defendant seeks is to be found in the indictment or in some acceptable alternative form, no bill of particulars is required . . . .").

---

2 The "double jeopardy" justification for awarding particularization appears to have limited vitality in the Second Circuit given judicial recognition that the factor "does not 'add anything to the functions previously described.'"   United States v. Payden, 613 F. Supp. 800, 816 n.14 (S.D.N.Y.), aff'd, 768 F.2d 487 (2d Cir. 1985) (quoting 1 C. Wright, Federal Practice and Procedure (Criminal) § 129, at 436-37 (2d Ed. 1982)).   Concern over this factor has also been described as "unfounded" given that following trial, defendants have available the entire record of proceeding, not simply the indictment, in the event they are later put in jeopardy for some aspect of a previously charged offense.   United States v. Shoher, 555 F. Supp. 346, 351 (S.D.N.Y. 1983) (citing Russell v. United States, 369 U.S. 749, 764 (1962)).

### 2.      The Requests in this Case Do Not Meet the Legal Threshold

Here, the government has provided everything it has to the defendant concerning the phone redetermination of benefits occurring on December 19, 2013.   Specifically, the government provided the script that the SSA claims representative used during the December 19 redetermination interview.   The government also provided a copy of the "Redetermination Summary," which memorialized the colloquy that occurred during the December 19 phone redetermination and was mailed to the defendant at his then-home of record.   These documents in tandem with the specifics alleged in the Indictment more than adequately notify the defendant of what he is charged with and what he must be prepared to defendant against.   Accordingly, there is no need for a bill of particulars.   See United States v. Walsh, 194 F.3d 37, 44-47 (2d Cir. 1999) (affirming trial court's denial of a bill of particulars where the indictment gave the defendant adequate notice of the charges against him, allowed him to prepare a defense and protected him from double jeopardy and where the government "made sufficient disclosures concerning its evidence and witnesses by other means"); Torres, 901 F.2d at 234 (affirming trial court's denial of bill of particulars in part because the defendant was provided with significant discovery material; "'Acquisition of evidentiary detail is not the function of the bill of particulars.") (citation omitted); Payden, supra, 613 F. Supp. at 817.


### F.      The Motion for Brady Material Should Be Denied

The defendant has prepared a list of requests he claims are controlled by Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).   Pursuant to Brady and its progeny, the government is under an affirmative duty to provide a defendant

16

with exculpatory evidence, as well as evidence that the defense might use to impeach the government's witnesses at trial.  See United States v. Bagley, 473 U.S. 667 (1985).  The government is fully aware of its obligations and responsibilities under Brady and acknowledges its continuing duty under Brady to produce such material, if and when it is aware of it.

However, the Brady doctrine does not cover many of the requests made by the defendant.  Contrary to the expansive notions underlying the defendant's requests, Brady does not create a constitutional right of pretrial discovery in a criminal proceeding and does not require that the prosecution reveal before trial the names of all of its witnesses. Weatherford v. Bursey, 429 U.S. 545, 559 (1977); see also United States ex rel. Lucas v. Regan, 503 F.2d 1, 3 n.1 (2d Cir. 1974) (noting that "neither Brady nor any other case we know of requires that disclosures under Brady must be made before trial").   Evidence that is not exculpatory, but is relevant for the purposes of impeachment, must be produced to the defense, but need not be turned over in advance of trial.   United States v. Nixon, 418 U.S. 683, 701 (1974).   Brady does not require the disclosure of evidence affecting the credibility of prosecution witnesses prior to such time as it would otherwise become available under the discovery rules or the Jencks Act.   See United States v. Dotel, 1994 U.S. Dist. LEXIS 491, *7-*8 (S.D.N.Y. 1994) (stating the long held view in the this Circuit that Brady impeachment material regarding the government's witnesses - i.e., Giglio material - is properly disclosed when the witness testifies at trial); United States v. Feldman, 731 F. Supp. 1189, 1200 (S.D.N.Y. 1990); United States v. Victor Teicher & Co., L.P., 726 F. Supp. 1424, 1442-43 (S.D.N.Y. 1989).   Typical impeachment material is normally disclosed at the time the 3500 material is turned over - after the government witness has testified on direct examination.   18

U.S.C. § 3500(b); United States v. Payden, 613 F. Supp. 800, 821 (S.D.N.Y. 1985), aff'd, 768 F.2d 487 (2d Cir. 1985).   Further, Brady does "not require the government to do defense counsel's pretrial preparation, nor develop defense strategy, nor does it require the government to point out the obvious." United States v. Larson, 567 F. Supp. 500, 503 (S.D.N.Y. 1983); see United States v. Ruggerio, 472 F.2d 599, 604 (2d Cir. 1973) ("The purpose of the Brady rule is not to provide a defendant with a complete disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied access to exculpatory evidence known to the government but unknown to him.").

In this case, the government agrees to provide impeachment Brady material in accordance with the schedule set by the District Court prior to trial and no later than when the government produces and delivers the Jencks Act material in this case.   Courts have routinely held that a prosecutor's compliance with the disclosure of material under the Jencks Act is timely disclosure under Brady.   See United States v. Martino, 648 F.2d 367, 384 (5th Cir. 1981) (noting that "'when alleged Brady material is contained in Jencks Act material, disclosure is generally timely if the government complies with the Jencks Act.'") (citation omitted); United States v. Anderson, 574 F.2d 1347, 1352 (5th Cir. 1978) (same); United States v. Persico, 621 F. Supp. 842, 870 n.3 (S.D.N.Y. 1985) (same).

For the above reasons, the government hereby requests that the Court deny, at this pre-trial stage, the defendant's motions in this regard.

**G.**      **Defendant's Request for Disclosure of Evidence Pursuant to Federal Rules of Evidence 404(b), 608, and 609 Is Premature**

The defendant moves for pretrial disclosure of any evidence the government intends to introduce at trial pursuant to Rules 404(b), 608 and 609 of the Federal Rules of Evidence. The government will provide notice of such information to the defense pursuant to the District Court's trial scheduling order, which has yet to be issued.

Rule 404(b) of the Federal Rules of Evidence requires the government to provide "reasonable notice in advance of trial" of the "general nature" of prior uncharged crimes that the government intends to use at trial.   No set timetable for notice is required, however, because evidence the government may seek to offer at trial often changes as the proof unfolds or as possible defenses are revealed at trial.   United States v. Aguirre-Parra, 763 F. Supp. 1208, 1217 (S.D.N.Y. 1991).   The reasonableness of Rule 404(b) notice is determined by the particular circumstances of the case.   United States v. Falkowitz, 214 F. Supp. 2d 365, 393 (S.D.N.Y. 2002) (permitting disclosure of Rule 404(b) evidence two weeks before trial).

The government will disclose evidence in its possession which might fall within the ambit of Fed. R. Evid. 404(b), 608, and 609, and will provide notice of its intention to rely upon such evidence at the time it is ordered to do so by the trial court.   With respect to the disclosure of evidence which falls within the ambit of Rule 608, the government notes that it has no obligation to provide a defendant with any information that could be used to impeach him pursuant to Rule 608, should he elect to testify.   See United States v. Livoti, 8 F. Supp. 2d 246, 250 (S.D.N.Y. 1998); see also, United States v. Song, 1995 WL 736872 *7 (S.D.N.Y. 1995) ("Rule 608 and 609 do not require the government to produce notice of impeachment

evidence."); <u>United States v. Comere</u>, 1996 WL 492704 *2 (N.D.N.Y. 1996) (noting that it is premature to disclose impeachment evidence until witnesses testify.).

Furthermore, the government preliminarily notifies the defendant that it intends to introduce at trial, pursuant to Rule 404(b), evidence of all prior criminal conduct acts or wrongs of the defendant, including but not limited to all incidents delineated in the defendant's criminal history report, for the purpose of showing proof of the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, and the absence of mistake or accident.   This notice is only preliminary in nature and is not intended to foreclose the government from relying on other Rule 404(b) evidence should it deem the introduction of such evidence appropriate at the time of trial.   The government will provide the defendant with more definitive notice of its intent to rely on 404(b) evidence when directed by the trial judge, or during trial, if the trial judge excuses pretrial notice on the showing of good cause.   In accordance with usual administrative practices of the trial court, issues relating to the admissibility and use of such evidence should be resolved by the trial judge at the time of the pretrial conference in this case.

## H.   The Request for Early Disclosure of Jencks Act Material Should Be Denied

The defendant seeks disclosure of <u>Jencks</u> Act material.   It is likely that the pretrial order will require witness statements specified in Title 18, United States Code, Section 3500, well in advance of trial, typically two to four weeks in advance, and the government will comply with that order.   Notwithstanding this agreement, the government reserves the right to argue to the District Court that, with regard to any particular witness, a legitimate concern for the safety of the witness outweighs any need for pre-trial disclosure of such statements.

The defendant has otherwise failed to make any showing of good cause for earlier pre-trial disclosure or expedited relief.   See United States v. Coppa, 267 F.3d 132 (2d Cir. 2001). Accordingly, the motion should be denied.


I.      **Preservation of Rough Notes**

The defendant requests that all government agents and officers who participated in the investigation of the defendant in conjunction with this case be ordered to retain and preserve all evidence, specifically including rough notes, generated in connection with the investigation.   The United States has no objection to the request that the government agents retain notes taken during the investigation of this case.   As a matter of routine practice, all federal law enforcement agencies already do so; and the prosecutor will request that the agents retain their notes relevant to this investigation, which notes have not resulted in the preparation of a final report.   See United States v. Wei, 862 F. Supp. 1129, 1139 (S.D.N.Y. 1994).   However, the government notes that defendant's request covers material that may not be Jencks material and so may exceed the government's obligation under 18 U.S.C. 3500 and Fed. R. Crim. P. 26.2.   The retention of agents' notes is not required as long as the notes are subsequently incorporated into a final report.   United States v. Elusma, 849 F.2d 76, 79 (2d Cir. 1988); United States v. Sanchez, 635 F.2d 47, 66 n.20 (2d Cir. 1980); United States v. Percan, 1999 WL 13040 (S.D.N.Y. 1999); United States v. Hilario, 1990 WL 106831 (S.D.N.Y. 1990).   Moreover, even if retained, rough notes are not discoverable, even as Jencks Act material.   United States v. Koskerides, 877 F.2d 1129, 1133 (2d Cir. 1989).

**J.      Defendant's Motion for Leave to Make Other Motions Is Premature**

The defendant moves to allow himself to make further and additional motions.   The defendant will be able to raise legal issues before trial to the extent the issues are not stale under Rule 12(b).   To the extent that the defendant later establishes good cause for a failure to make a timely pre-trial motion, the United States will not oppose a request for the additional motion, if there is merit to the motion.   Nevertheless, the Court should not excuse the defendant, in advance, of the requirement that he show good cause for making a late pre-trial motion.

**K.      Government's Cross Discovery Demand**

Pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure, the government hereby demands that the defendant provide the government the opportunity to inspect and copy or photograph books, papers, documents, photographs, tangible objects or copies or portions thereof which are within the possession, custody or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial.

In addition, the government also demands that the defendant permit the government to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case or copies thereof within the possession or control of the defendant which the defendant intends to introduce as evidence in chief at trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to that witness's testimony.

Finally, the government will demand, upon the District Court's setting a trial date and accompanying Scheduling Order, that the defendant provide a summary of any testimony that the defendant intends to use under Rule 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial.

## III.   CONCLUSION

The government respectfully requests that for the foregoing reasons, and except as set forth above, the defendant's pre-trial motions should be denied.


DATED:        Buffalo, New York, April 17, 2015.

                             WILLIAM J. HOCHUL, JR.
                             United States Attorney


                     BY:    s/FRANK T. PIMENTEL
                             Assistant U.S. Attorney
                             U.S. Attorney's Office
                             Western District of New York
                             138 Delaware Avenue
                             Buffalo, New York 14202
                             (716) 843-5868
                             Frank.T.Pimentel@usdoj.gov