<pre>
 1                    UNITED STATES DISTRICT COURT

 2                   WESTERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - X
     UNITED STATES OF AMERICA              14-CR-164(WMS)
 4
     vs.
 5                                         Buffalo, New York
     ARI ELIAS BAUM,                       September 27, 2016
 6              Defendant.                 9:36 a.m.
     - - - - - - - - - - - - - X
 7
                     TRANSCRIPT OF PROCEEDINGS
 8          BEFORE THE HONORABLE JEREMIAH J. MCCARTHY
                 UNITED STATES MAGISTRATE JUDGE
 9

10                    WILLIAM J. HOCHUL, ESQ.
                      United States Attorney
11                    BY: FRANK T. PIMENTEL, ESQ.
                      Assistant United States Attorney
12                    138 Delaware Avenue
                      Buffalo, New York 14202
13

14                    MARIANNE MARIANO, ESQ.
                      Federal Public Defender
15                    BY:  BRIAN P. COMERFORD, ESQ.
                           FONDA D. KUBIAK, ESQ.
16                         JEFFREY BAGLEY, ESQ.
                           MARTIN VOGELBAUM, ESQ.
17                    Assistant Federal Public Defenders
                      300 Pearl Street, Suite 450
18                    Buffalo, New York 14202
                      Appearing on behalf of the Defendant
19

20   AUDIO RECORDER:    Debbie Zamito

21
     TRANSCRIBER:       Christi A. Macri, FAPR-CRR
22                      Kenneth B. Keating Federal Building
                        100 State Street, Room 2120
23                      Rochester, New York 14614

24

25   (Proceedings recorded by electronic sound recording,
     transcript produced by computer).
</pre>

1                           **I N D E X**

2

3     **WITNESS FOR THE GOVERNMENT**

Randy Garver
4         Direct examination by Mr. Pimentel          Page  7
          Cross-examination by Mr. Comerford          Page 19
5         Redirect examination by Mr. Pimentel        Page 31
          Recross-examination by Mr. Comerford        Page 33
6         Redirect examination by Mr. Pimentel        Page 36

7

8

9

10

| EXHIBIT | RECEIVED |
|---------|----------|
| Government 1 | 14 |
| Government 2 | 15 |
| Government 3 | 17 |
| Government 4 | 46 |

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2                          *   *   *

3              **(WHEREUPON,** the defendant is present).

4              **THE CLERK:** All rise.

5              **MAGISTRATE JUDGE MCCARTHY:** Good morning.  Please be

6    seated.

7              **THE CLERK:** On the record, this is United States vs.

8    Ari Elias Baum, case number 14-CR-164.

9              For the Government, Frank Pimentel.

10             For the defendant, Brian Comerford, Fonda Kubiak,

11   Jeffrey Bagley and Martin Vogelbaum.

12             The defendant is present.

13             We are here for an evidentiary hearing, the

14   Honorable Jeremiah J. McCarthy presiding.

15             **MAGISTRATE JUDGE MCCARTHY:** Good morning, Mr. Baum.

16   Good morning, counsel.

17             **MR. PIMENTEL:** Good morning, Your Honor.

18             **MS. KUBIAK:** Good morning, Your Honor.

19             **MR. COMERFORD:** Good morning, Your Honor.

20             **MAGISTRATE JUDGE MCCARTHY:** Are we ready to proceed?

21             **MR. PIMENTEL:** We are, Your Honor.  A couple of

22   preliminary issues -- well, one really.  I anticipate calling

23   one witness and there are four exhibits.  I've given copies to

24   counsel and to the -- to your courtroom deputy.

25             In the process of preparing for the hearing, I

1    learned that there is one or more FBI 302's that were written

2    in conjunction with obtaining and executing the search

3    warrant.  I learned that they are classified presently as

4    secret, which is an impediment to obtaining them and turning

5    them over at this time.

6             With that said, I have a general description of

7    what the information therein is, to the extent it's not

8    classified, provided that to counsel and I think it's his

9    position that they are okay with proceeding today.

10             We will go through the process of getting the

11   documents declassified and then when we do that turn them

12   over.  Obviously, if that results in defense requesting to

13   reopen the cross-examination, we wouldn't have any objection

14   to that, you know, provided that the grounds are reasonable,

15   but I don't anticipate that will happen from what I

16   understand.

17             So I wanted to --

18             **MAGISTRATE JUDGE MCCARTHY:** How long do you think

19   the process of getting them declassified will take?

20             **MR. PIMENTEL:** I understand it's at least several

21   weeks, but I don't know if Agent Garver has any more of an

22   understanding on that than I do.

23             **THE WITNESS:** Typically what will occur --

24             **MAGISTRATE JUDGE MCCARTHY:** Sir, could you just step

25   up to the mic, please, so we have it on the record?  And just

1  state your name.

2           **THE WITNESS:** Yes, sir.  My name is Randall E.

3  Garver, Special Agent with the FBI.

4           **MAGISTRATE JUDGE MCCARTHY:** Okay.

5           **THE WITNESS:** Typically what will happen in these

6  national security investigations is we'll either courier,

7  bring over all of the source reporting documents and the

8  FD-302's that are classified --

9           **MAGISTRATE JUDGE MCCARTHY:** Mm-hmm.

10          **THE WITNESS:** -- to the U.S. Attorney's Office where

11  they can view them and store them; or we can bring the

12  Assistant U.S. Attorney to our office to view them and we

13  store them.

14          And what he can do then is make a determination

15  what he wants, what he doesn't want.  And then the FBI will go

16  through a process where we submit those documents to the FBI's

17  counterterrorism division who ultimately with a legal review

18  determines with the DOJ folks as well obviously, sir, what can

19  be declassified and then used in open court ultimately is the

20  objective with that.

21          **MAGISTRATE JUDGE MCCARTHY:** Okay, thank you.

22          **THE WITNESS:** Yes, sir.

23          **MAGISTRATE JUDGE MCCARTHY:** Mr. Pimentel, you say

24  you've given Mr. Comerford a summary of --

25          **MR. PIMENTEL:** Yes.

1          **MAGISTRATE JUDGE MCCARTHY:** Is that orally or

2   written or --

3          **MR. PIMENTEL:** No, orally.  We discussed this issue

4   briefly before court today.  It's, generally speaking, Judge,

5   it's my understanding that to the extent that any such

6   documents are relevant to this -- the scope of this hearing,

7   they are essentially administrative in nature; I did this, I

8   did that sort of thing.

9          So based on that, I don't anticipate that there

10  would be anything substantive requiring this be reopened, but

11  I wanted to alert the Court to it and I obviously wanted to

12  alert counsel to it.

13         **MAGISTRATE JUDGE MCCARTHY:** I appreciate that.

14  Mr. Comerford, are you prepared to proceed in that fashion,

15  reserving your rights?

16         **MR. COMERFORD:** Yes, Judge.  Provided that --

17  provided that when they are declassified, they are turned

18  over, we have an opportunity to review them.  If there's some

19  issue in there that we think needs to be reopened, we have an

20  opportunity to do that.

21         Based on what Mr. Pimentel and Agent Garver have

22  told me this morning, I don't think there's anything there

23  that would require reopening the hearing, but just to be

24  thorough and do our jobs I would like to eventually look at

25  them.

1          **MAGISTRATE JUDGE MCCARTHY:** Okay, all right.

2          **MR. COMERFORD:** Thank you, Judge.

3          **MAGISTRATE JUDGE MCCARTHY:** Fair enough.

4          **MR. PIMENTEL:** That's it, Your Honor.

5          **MAGISTRATE JUDGE MCCARTHY:** Thanks for the head's up

6  on that.  Counsel, just so we're all on the same page here in

7  terms of what the scope of today's hearing is, I think that we

8  discussed at our last proceeding on August 12th and then I

9  think my August 12th text order, which is Docket No. 73, sets

10  out what I view the scope of the hearing to be, correct?

11          **MR. PIMENTEL:** Yes, yes, Your Honor.

12          **MAGISTRATE JUDGE MCCARTHY:** All right. And with that

13  we can proceed.

14          **MR. PIMENTEL:** Thank you, Your Honor.  We call

15  Special Agent Randall E. Garver.

16          <u>**GOVERNMENT'S WITNESS, RANDALL E. GARVER, SWORN**</u>

17                    <u>**DIRECT EXAMINATION**</u>

18          **THE CLERK:** Would you state your name for the record

19  and spell your first and last name?

20          **THE WITNESS:** Sure, my name is Randall E. Garver,

21  R-A-N-D-A-L-L, E, Garver, G-A-R-V-E-R.

22          **THE CLERK:** Thank you.

23  **BY MR. PIMENTEL:**

24  Q.   Good morning, Special Agent Garver.  Could you tell the

25  Court where you are employed?

1  A.    Sure, I'm a special agent with the Federal Bureau of

2  Investigation here in Buffalo.

3  Q.    How long have you been a special agent with the FBI, sir?

4  A.    Just over ten years.

5  Q.    And going back to your education, your post high school

6  education, could you describe that for the Court?

7  A.    Sure.  I graduated high school and then attended Kansas

8  State University for one year and then went to the United

9  States Military Academy, graduated and was an Army officer

10  about five years.

11  Q.    Okay. When did you graduate from West Point, sir?

12  A.    2000.

13  Q.    And briefly which branch of the Army were you in?

14  A.    I was an infantry officer.

15  Q.    Served in Iraq?

16  A.    Served in Kosovo and Iraq, yes, sir.

17  Q.    When did you leave active duty?

18  A.    July 1st, 2005.

19  Q.    So it sounds like you did -- fulfilled your five year

20  commitment?

21  A.    Yes.

22  Q.    And then you became an agent in --

23  A.    May in 2006.

24  Q.    What have your assignments been with the FBI?

25  A.    I was in Cleveland from 2006 to 2009, worked on a Gang and

1   Drug Task Force there.  Then I went to the Washington field

2   office and worked on a Gang Task Force before being moved over

3   to extraterritorial crimes for Iraq and Afghanistan.

4           After that I came to Buffalo in February 2013, was

5   on the Joint Terrorism Task Force for just under two years and

6   since January of 2015, I've been on the Child Exploitation

7   Task Force here in Buffalo.

8   Q.   Your experience with being the affiant on search warrants,

9   can you describe that for the Court?

10  A.   Sure.  I've sworn out numerous search warrants for

11  everything from vehicles to locations, homes, Facebook pages,

12  e-mail accounts.  So I've done a couple of them on national

13  security investigations and quite a few on drug violations and

14  child exploitation violations.

15  Q.   Some time in -- directing your attention then to 2013, did

16  an individual named Ari Baum come to your attention in your

17  professional capacity?

18  A.   Yes.

19  Q.   How did that come about?

20  A.   I was assigned what we call a "guardian lead," which

21  entailed an individual in Buffalo, New York making a reference

22  to the FBI.  And that came to my desk, it essentially said

23  investigate what's alleged.

24  Q.   And what was the -- what was the nature of the concern?

25  A.   There were two individuals located in Buffalo who advised

1  that there were statements and things said that they were

2  concerned with, and ultimately led them to contact the FBI

3  to -- to -- to provide us that information.

4  Q.   Did you at some point alert the U.S. Attorney's Office?

5  A.   We did eventually, yes.

6  Q.   All right.  How did that come about?

7  A.   So for several months we continued to speak to --

8  obviously looked through FBI files and found out the San

9  Francisco division had investigated Mr. Baum as well; and then

10 we spoke to a number of other individuals here in Buffalo who

11 provided us information that corroborated what the first two

12 individuals told us.

13         And began looking at his Facebook pages -- or

14 Mr. Baum's Facebook page and ultimately when we thought we had

15 enough to search those pages, we provided our -- the results

16 of our investigation thus far to the U.S. Attorney's Office.

17 Q.   So it was at the point -- do I understand correctly then

18 it was at the point where you were desiring to obtain a search

19 warrant, that's about when you looped in the U.S. Attorney's

20 Office?

21 A.   I think they were up to speed preliminarily before that,

22 but not -- not too much, but it was ultimately said I think

23 we're going to want to search these accounts, we started

24 getting Mr. Campana on board and understanding what we have

25 and what we need to do.

1  Q.   And when you say "Mr. Campana," you're referring to Paul

2  Campana, who was an AUSA?

3  A.   That's right, yes, sir.

4  Q.   Was he the head of the national security section at the

5  U.S. Attorney's Office at the time, do you know?

6  A.   I don't know if he was the head.  He was certainly one of

7  the national security prosecutors that was assigned to this

8  investigation.

9  Q.   Okay. And Mr. Campana is now retired?

10 A.   That's correct.

11 Q.   So you -- did you have a meeting with Mr. Campana then in

12 conjunction with the attempts to obtain a search warrant?

13 A.   Yes, we did.

14 Q.   And did you have more than one?

15 A.   I think there were at least two meetings and both in his

16 office, and then at the FBI following a case meeting that the

17 U.S. Attorney's Office attended there.  We sat down with him

18 and discussed what we need to do; if we're gonna be able to

19 search these accounts, what -- essentially what the FBI needed

20 to be able to do here, what we need to show to make that

21 happen.

22 Q.   So he advised you on that process?

23 A.   Yes.

24 Q.   All right.  And what did you do as a result of his advice?

25 A.   Well, we got -- we got more into looking at the two

1  Facebook pages that were the subject of the affidavit and

2  attempting to show that there's probable cause for that

3  search.

4  Q.  When you say "looking at the Facebook pages," was --

5  was -- do you actually mean that you were looking at certain

6  material on Facebook?

7  A.  Yes.  The accounts were open at that time, meaning you can

8  just go to the page and view what the posts are.

9  Q.  All right.  And this was -- you're referring to Ari Baum's

10  account?

11  A.  That's one account, yes.

12  Q.  Okay. So -- so you gathered information and then did you

13  reduce this to a draft affidavit?

14  A.  We did, yes.

15  Q.  All right.  And what did you do with the draft affidavit?

16  A.  Once I thought we had an affidavit that was in order, I

17  would have provided that to Mr. Campana of the U.S. Attorney's

18  Office who -- I can't remember if he made additional revisions

19  once that affidavit was sent, but ultimately that -- he told

20  me he agreed that we had probable cause and decided that we

21  would submit it to the Court.

22  Q.  So then did he, to your understanding, submit the

23  affidavit with an application to the Court?

24  A.  Yes, he did, yes.

25  Q.  All right.  If you would refer to Government's Exhibit 1,

1  which is sitting on the desk in front of you --

2  A.   Right.

3  Q.   -- do you see that document?

4  A.   I do, yes, the application.

5  Q.   If you could just briefly flip through that?

6  A.   Right.  This is the application for the search warrant as

7  well as the affidavit.

8  Q.   All right. And the affidavit was sworn out by you?

9  A.   Yes, sir, yup.

10 Q.   So this was the affidavit -- and then if you would look at

11 the last three pages of the document?

12 A.   Sure.

13 Q.   You see that?

14 A.   Yes.

15 Q.   Attachment A and Attachment B, do you recall who drafted

16 those?

17 A.   I drafted these and I remember having a conversation with

18 Mr. Campana about them, but I'm not sure if he made revisions

19 or not.  I remember going through what should be on

20 particularly Attachment A.

21 Q.   Okay. So you submitted all of this then, the affidavit and

22 the attachments, the proposed attachments, to Mr. Campana and

23 after some revisions and then he submitted them to the Court;

24 is that your understanding?

25 A.   That's right, yes.

1  Q.   Okay.  And then you obtained a time to meet with the

2  judge?

3  A.   Correct.

4  Q.   And so you and Mr. Campana went and met with Magistrate

5  Judge Schroeder?

6  A.   That's correct, yes.

7  Q.   And you signed the affidavit in the presence of Magistrate

8  Judge Schroeder?

9  A.   Yes.

10  Q.   And that was on November 21st of 2013?

11  A.   Yes, sir.

12  Q.   Okay.

13          **MR. PIMENTEL:** Your Honor, at this time I would move

14  in to evidence Government's Exhibit 1.

15          **MR. COMERFORD:** No objection, Judge.

16          **MAGISTRATE JUDGE MCCARTHY:** Okay, Government's

17  Exhibit 1 is in evidence.

18          (**WHEREUPON**, Government Exhibit 1 was received in a

19  evidence).

20  **BY MR. PIMENTEL:**

21  Q.   And then as a result of that, was it your understanding

22  that Mr. Campana had, with your application or with your

23  affidavit, submitted a proposed search warrant along with the

24  application to Magistrate Judge Schroeder?

25  A.   Yes.

1  Q.   Okay. And would that be Government's Exhibit 2?

2  A.   Yes, it would.

3  Q.   All right. And Magistrate Judge Schroeder, did he sign

4  that in your presence to your recollection?

5  A.   Yes.

6  Q.   In fact, if you would look at the third and fourth pages

7  of Government's Exhibit 2, do you see where there is an X with

8  some initials and a date?

9  A.   Yes, I do.

10  Q.   All right.  And does that -- did Magistrate Judge

11  Schroeder do that in your presence?

12  A.   Yes, he did.

13  Q.   Okay. So Government's Exhibit 2 then, would that be the

14  warrant that was issued?

15  A.   Yes, it is.

16  Q.   All right.

17          **MR. PIMENTEL:** Judge, I would move into evidence

18  Government's Exhibit 2.

19          **MR. COMERFORD:** No objection.

20          **MAGISTRATE JUDGE MCCARTHY:** Government Exhibit 2 is

21  in evidence.

22          (**WHEREUPON**, Government Exhibit 2 was received into

23  evidence).

24  **BY MR. PIMENTEL:**

25  Q.   Now, after -- so this was on November 21st of 2013, that

1  he -- that Magistrate Judge Schroeder signed the warrant?

2  A.   Yes.

3  Q.   All right.  Did it come to your attention subsequently

4  that -- or had you discussed with Mr. Campana the need to

5  preclude Facebook from disclosing the existence of the search

6  warrant to Mr. Baum?

7  A.   Yes, we did.

8  Q.   All right.  And could you tell the Court about that

9  discussion?

10  A.   Well, it's the understanding of myself and the FBI that

11  when giving -- given Government process, Facebook will

12  immediately notify or at some point will notify individuals

13  that the FBI served a search warrant or served a grand jury

14  subpoena upon Facebook for their user or their customer's

15  information.

16          If that were to occur in this case, we were

17  concerned it would compromise the existence of the

18  investigation and ultimately what -- we're gaining information

19  about information that greatly concerned the FBI in Western

20  New York.

21          So should -- the FBI essentially would lose a

22  collection platform, something we were getting information

23  from, if they were to immediately notify the user that we

24  served a grand jury -- correction, served a search warrant

25  upon them.

1  Q.   So did Mr. Campana have a potential remedy to prevent that

2  from happening?

3  A.   Well, he told me we could apply for and seek a court order

4  that would prevent that.

5  Q.   All right.  If you look at Government's Exhibit 3, do you

6  recognize that document?

7  A.   I do.

8  Q.   And what is this?

9  A.   It's an application for an order commanding Facebook not

10 to notify any person of the existence of the search warrant.

11 Q.   And would you look at page 3, the third page of that

12 document?  Who signed that document?

13 A.   AUSA Paul Campana.

14 Q.   All right.  And then attached to the document, that is the

15 last four pages of the document, what is that?

16 A.   That's the search warrant.

17 Q.   All right.  And was it your understanding that Mr. Campana

18 submitted this to Magistrate Judge Schroeder?

19 A.   Yes.

20           **MR. PIMENTEL:** Judge, I would move in Government's

21 Exhibit 3.

22           **MR. COMERFORD:** No objection.

23           **MAGISTRATE JUDGE MCCARTHY:** All right, Government

24 Exhibit 3 is in evidence.

25           (**WHEREUPON**, Government Exhibit 3 was received into

1  evidence).

2  **BY MR. PIMENTEL:**

3  Q.   And then did Magistrate Judge Schroeder issue an order

4  after submission of that application -- of the Government's

5  Exhibit 3 application?

6  A.   Yes.

7  Q.   Would that be Government's Exhibit 4?

8  A.   Yes, it is.

9  Q.   All right. Now, you obtained a copy of this Government's

10  Exhibit 4, did you not?

11  A.   We did, yes.

12  Q.   All right. And -- and when you had obtained the order and

13  the search warrant, what did you do with those documents

14  *vis-a-vis* Facebook?

15  A.   These get served directly to Facebook.  So ultimately

16  we -- ultimately these, the search warrant as well as these --

17  the court orders get sent to Facebook.

18          So now Facebook has a law enforcement system where

19  you upload it directly electronically.  I don't recall from

20  2013, but for some reason I remember faxing it to them.  They

21  may have been taking it by fax then, but -- so either we faxed

22  it to them or we uploaded it.

23          But we found out whatever the process was that

24  Facebook receives legal process and adhered to however they

25  wanted to get it.

1  Q.    And you oversaw the process in making sure that these

2  documents got to Facebook?

3  A.    Yes.

4  Q.    Okay. Special Agent Garver, did you go to law school?

5  A.    No, no.

6  Q.    You had some legal training at the Academy; fair to say?

7  Or at the FBI Academy?

8  A.    Some, yes.

9  Q.    Okay. You're not a lawyer?

10  A.    No.

11  Q.    You rely on Assistant U.S. Attorneys for your legal

12  advice; is that correct?

13  A.    Yes, sir.

14  Q.    All right.  Did you have any basis to believe that there

15  was anything wrong with the search warrant in this case?

16  A.    No, absolutely not.

17           **MR. PIMENTEL:** No further questions.

18           **MAGISTRATE JUDGE MCCARTHY:** Thank you.

19                     **CROSS-EXAMINATION**

20  **BY MR. COMERFORD:**

21  Q.    Good morning, Agent Garver.

22  A.    Good morning, sir.

23  Q.    I want to look at Government Exhibit 1.  Do you have that

24  in front of you still?

25  A.    I do, yes.

1  Q.   And I can put it up on the ELMO here if that's

2  (inaudible).

3           **MAGISTRATE JUDGE MCCARTHY:** You may be over teching

4  it, Mr. Comerford.

5           **MR. COMERFORD:** I'm sorry, Judge.

6           **MAGISTRATE JUDGE MCCARTHY:** That's all right, but we

7  all have hard copies here, but whatever.

8           **MR. COMERFORD:** You do?  Okay.

9  **BY MR. COMERFORD:**

10 Q.   You said that you drafted this Attachment A?

11 A.   Yes.  I know I initially drafted it.  I'm not sure if

12 Mr. Campana had revisions.

13           So usually what I'll do and I did in this case is I

14 submit the affidavit along with the Attachment A and

15 Attachment B and I go through it.

16 Q.   Okay.

17 A.   But ultimately, as often happens, the AUSAs will say I

18 don't like this and change this and typically I just don't

19 argue with them on any of that stuff.  I say however you like

20 to do it we'll do it.

21 Q.   Okay. And what's the -- can you describe at all the

22 process for when you get the information from Facebook, did

23 you review it?

24 A.   I reviewed it as well as some of the intelligence analysts

25 and other FBI agents working on this case.

1  Q.   Okay. And what -- what would you say was the timeframe for

2  doing that, if you could estimate?

3  A.   Well, we received the return -- I'd have to look back in

4  the case file as to day, but Facebook is fairly timely.  And

5  within the next -- I remember it was a large return.  I mean,

6  when those come in, they're electronic documents and they

7  are -- it's, you know, it's all the chats and the contents of

8  the chats and the pictures.

9         So I'd hesitate to put a timeframe on how long it

10  took for the analysts and myself to go through it, but a

11  period of months I would say is an estimate.

12  Q.   A period of months.  And that's to review, as you said,

13  all of the chats and the pictures.  In your experience, what

14  are the sorts of things that Facebook turns over when you send

15  them this sort of a request?

16  A.   They will send -- they will go from the timeframe that's

17  requested and that's authorized by the Court, what's listed in

18  Attachment A.

19         So on this one when we asked for the photographs

20  and we asked for the posting user ID and we asked for the

21  contents of the chats and things he liked or things he

22  reposted, all of that kind of stuff, they develop or they will

23  send us that in electronic document that then can be -- it's

24  actually fairly user friendly.  You can search for specific

25  terms and search for specific users on there.

1            But that's what they will give you, but it will

2  only encompass that timeframe that the judge authorized.

3  Q.   So you're saying that basically the time -- you asked

4  the -- you asked Facebook for a certain date to a certain date

5  and that's what they provided you?

6  A.   Right, yes, sir.  Like on this one, March 1st, 2013, so

7  they didn't give us communications from 2010 or 2011.

8  Q.   Okay.  Would you say it's still a fairly large document

9  they provide you?

10  A.   It is a large document, sure, I would agree with that.

11  Q.   Because if it takes a couple months to review?

12  A.   Yes.

13  Q.   For several people to review?

14  A.   Yes.

15  Q.   And you're reviewing it to see whether there's evidence of

16  material support of terrorism?

17  A.   Yes.

18  Q.   Yes.  This -- looking back at Attachment A, if you look at

19  paragraph (a) on the first page and then paragraph (b) on the

20  second page, is it safe to say that there's like a

21  two-step process here?

22  A.   You mean by isolating those pages --

23  Q.   Yes.

24  A.   -- and then -- yes.

25  Q.   Can you describe that at all?

1  A.   I don't know how they necessarily do that, but essentially

2  my understanding from -- from dealing with Facebook and other

3  communication providers like that is they -- they're able

4  to -- by "isolate" it means take only the contents of that

5  account and no one else's and then put that onto some sort of

6  usable format, a PDF file, sometimes they give us something on

7  a DVD and then they send just that.

8            So essentially you're -- you're getting only --

9  basically you're getting exactly what the warrant authorizes,

10 but you're not going to get more.

11 Q.   Okay. So Facebook isolates it, provides it to the FBI?

12 A.   That's right, yeah, we don't do that.

13 Q.   And then paragraph (b) it says law enforcement, but it's

14 essentially the FBI here?

15 A.   That's us.

16 Q.   Reviews the materials provided by Facebook, right?

17 A.   Yes.

18 Q.   And at least the way this is written, the FBI doesn't

19 seize everything that's provided by Facebook?  Only those

20 materials that would constitute providing material support to

21 terrorists?

22 A.   Well, Facebook's not going to go through the account

23 before providing it to us.  So if you request a certain

24 account for a certain timeframe and that's authorized by the

25 judge, that's what you're getting.

1      They're not going to go through and say well, that

2  constitutes evidence of a crime, but this one doesn't.  They

3  don't do that in any type of case.  You're getting what's

4  called for and that's it.

5      And it's up to the FBI then to go through and

6  determine well, I think that's evidentiary and that's

7  something we want to show the U.S. Attorney's Office; or

8  that's something that's exculpatory, we should make sure

9  everyone knows that, too.

10 Q.   And if -- is it everything then that the -- that the FBI

11 holds on to or seizes would you say?  Everything that's

12 provided by Facebook?

13 A.   Does that remain in our holdings?

14 Q.   Yes.

15 A.   Yes, it does.

16 Q.   It does.  And were you part of -- is there -- is there a

17 process when you go through these?  You said if it's

18 evidentiary, you make a note of it; if it's exculpatory, you

19 make a note of it.

20     What do you do if it's neither?  If it has nothing

21 to do with providing material support to terrorists?

22 A.   You mean if it's just communications amongst friends and

23 about TV shows or something that we don't think is relevant to

24 a case?

25 Q.   Yes.

1  A.   We don't do anything with it.  We don't mark it, we don't

2  document it.  It just is there.

3  Q.   But it's retained by the FBI?

4  A.   Oh, it is because it's all on one electronic document.

5  There's, you know, a lot of times these things come to you as

6  a PDF file so you can't just -- you can't purge parts or

7  redact parts.  You get the whole document so...

8  Q.   Were you part of this case when the FBI contacted Social

9  Security?

10  A.   No, I was not.

11  Q.   So do you have any knowledge of when that took place?

12  A.   From that -- from this still being a case in my squad, it

13  was reassigned to another agent, a colleague of mine, and I

14  remember the conversations about it, say, at squad meetings

15  and just in the area.  Like hey, we're gonna look at it this

16  way, okay.

17          But I didn't -- I mean, if you asked me when did

18  you all contact, I don't know.  I don't know when we contacted

19  the Social Security.  I don't know what the findings were from

20  Social Security.

21  Q.   Was that when you were meeting with Mr. Campana -- sorry.

22          After you received the information from Facebook,

23  did you have more meetings with Mr. Campana about the case?

24  A.   We met briefly just to say hey, we got it and we're going

25  through it.  I remember giving him some updates just about

1  some of the things we were finding.

2           But at that point we were still looking to see --

3  it was real preliminary, it was, you know, this is hey, we do

4  have it and it was more of those types of conversations than

5  substantive about what's evidentiary and what's not.

6  Q.   And were any of those conversations about evidence of

7  Social Security fraud or anything with Social Security?

8  A.   I didn't have any conversations regarding any of that

9  stuff, any of the Social Security angle, I didn't even deal

10  with.

11          At some point, by "some point" within a month or

12  two months after receiving the Facebook return, the supervisor

13  over in the joint terrorism task force at the time said, hey,

14  you're really working -- I had a different case, which is a

15  money laundering thing and he said hey, this is -- you need to

16  just work this, we have other people that can do this, sit

17  with them, get them up to speed, show them what you've done,

18  show them where you think you're going.  So that's what we

19  did.

20  Q.   Do you know approximately when that happened?

21  A.   I'd be kind of guessing, but if you told me to put

22  something on it, January 2014, roughly.

23  Q.   Okay.

24  A.   Within a month or even two months after this.  It wasn't

25  long after the search warrant.  I mean, it wasn't the summer

1  of 2014, but it was -- it was fairly soon thereafter.

2  Q.   Okay. And at that point you still got updates about it,

3  but you weren't really involved in --

4  A.   Just from squad meetings, yeah.  So kind of go around and

5  everyone gets an understanding of who is working on what.  So

6  I would hear kind of what they're doing, but I didn't -- I

7  wasn't making any decisions or reading any reports at that

8  point.

9  Q.   In doing these -- have you ever done a -- I guess have

10 you -- do you know whether it's possible to ask Facebook for

11 just communications between say Mr. Baum and certain other

12 individuals?

13 A.   I've had conversations with their legal response people

14 and they won't do it.  They won't do it because they think

15 then they're acting as an agent of law enforcement.  And we've

16 asked them to do that to isolate stuff on child exploitation

17 cases and we've done that to kind of reduce the amount of

18 traffic we'll ultimately receive, you know, hey, we think this

19 guy is communicating with him, can we just get those

20 communications?

21          They won't -- they don't -- they won't hear of it.

22 They will say no, now you're trying to get us to act as you're

23 agent, you get it or you don't get it.

24          I've never dealt with that conversation on one of

25 these cases, but we have on child pornography cases, talked to

1  their legal folks about that.

2  Q.   So it's not something that basically Facebook's willing to

3  do?

4  A.   At least not from conversations with individual agents.

5  Maybe if somebody more senior and smarter legally than me

6  could figure out a way to do that, they might, but...

7  Q.   It's not something that's -- at least it's not

8  something -- you haven't given Facebook a search warrant that

9  says communications between one person and a couple other

10 people?  It's always --

11 A.   The contents of the page.

12 Q.   The contents of everything?

13 A.   Right.

14 Q.   With the idea being that you or the agency will go through

15 it, identify those things that are relevant to your -- to your

16 investigation?

17 A.   Yes, that's right.

18 Q.   When -- when you were reviewing this, there's one specific

19 conversation between Ari Baum and his father Bruce Baum on

20 Facebook.  Are you familiar with what I'm talking about?

21 A.   I did not see that from my review.  I recall others

22 telling me what they -- what they heard and what they read.

23 Q.   And did that -- telling you specifically about that

24 conversation?

25 A.   I remember folks just -- not in an official capacity.  I

1  remember guys in the squad area saying, hey, Randy, you know

2  what we found on that?  I said no.

3           And then they kind of -- I think the conversation

4  alluding to or something, I remember guys telling me, but

5  not -- again, not pursuant to my duties or anything.  It

6  wasn't like I was reviewing it, came across it and -- and had

7  other conversations about it, no.

8  Q.   Okay. So you're not in any position to tell us how that

9  conversation, I guess, became part of the investigation?

10 A.   No, I'm really not.

11 Q.   I'm referring to the conversation, Judge, just so it's

12 clear for the record, where to paraphrase Ari Baum's account,

13 says something along the lines of I'm overseas and if Social

14 Security knows I'm overseas they will turn off the benefits.

15           That's the specific conversation we're talking

16 about.

17 A.   Right.

18 Q.   You didn't -- that didn't come up in your review?

19 A.   No, I never -- I've never seen that from review or from --

20 I just heard about it, people talking about it.

21 Q.   Okay. And that -- from what you heard people talking

22 about, there was no discussion that that conversation would be

23 evidence of material support to terrorism ?

24 A.   No, I didn't hear anything along those lines either.

25 Q.   And there was no reason to believe that Ari's

1   conversations with his father would have anything to do with

2   material support to terrorism?

3   A.   No, not to my knowledge.

4   Q.   Okay.

5          **MR. COMERFORD:** Judge, if I could just have one

6   second?

7          **MAGISTRATE JUDGE MCCARTHY:** I'm sorry?

8          **MR. COMERFORD:** If I could just have one second?

9          **MAGISTRATE JUDGE MCCARTHY:** Sure.

10  **BY MR. COMERFORD:**

11  Q.   Who was the agent who took the case over for you?

12  A.   Special Agent Matt Hecker.  And there was an intelligence

13  analyst that also was -- worked fairly in-depth on it.

14  Q.   Do you know who that was?

15  A.   Her name is Intelligence Analyst Betsy DuSheer, which I'm

16  going to have to pull the spelling out of my thumb for you.

17  Q.   That's okay.  And --

18          **MAGISTRATE JUDGE MCCARTHY:** Excuse me, could you

19  spell Special Agent Matt -- what was his last name?

20          **THE WITNESS:** Hecker, sir, so H-E-C-K-E-R.

21          **MAGISTRATE JUDGE MCCARTHY:** Thank you.

22  **BY MR. COMERFORD:**

23  Q.   Ultimately as a result of this search warrant, nothing

24  came up in the -- from the Facebook warrant or from what was

25  turned over by Facebook that provided evidence that he was

1  providing material support to terrorism?

2  A.   Well, sir, I think ultimately, no, I don't think there was

3  anything that we would say this is superb evidence of material

4  support of terrorism.  But I think if you look at the case in

5  its entirety, you know, there were certainly concerns, valid

6  concerns at the FBI in Buffalo regarding what he was doing

7  overseas, who he was meeting with and then a refusal to answer

8  questions upon return to the United States.

9           You know, I think all of that led to us saying we

10  have to do something.  And so certainly seeking the search

11  warrant to Facebook is part of just completing our duty as to

12  what the heck is going on here with this guy.

13          But no, if you're saying what did you find and

14  where's the evidence that -- solid evidence of material

15  support, no, to my knowledge from when I was on the case we

16  didn't get something like that.

17              **MR. COMERFORD:** Thank you, Agent.

18              **THE WITNESS:** Yes, sir.

19              **MR. COMERFORD:** Nothing further, Your Honor.

20              **MR. PIMENTEL:** Judge, I have brief redirect.

21              **MAGISTRATE JUDGE MCCARTHY:** Okay.

22                   **REDIRECT EXAMINATION**

23  BY MR. PIMENTEL:

24  Q.   The -- Agent Garver, the conversation -- I guess the

25  informal conversations that you referred to about the exchange

1  between Mr. Baum and his father, do you recall describing that

2  for Mr. Comerford?

3  A.   Yes, I remember just other agents and at squad meetings

4  and folks in the office saying, hey, you know what we found in

5  there?  I said, no, what you'd get?

6            And they said, oh, you know, he admits that he was

7  receiving certain benefits that he wasn't entitled to.  I

8  said, oh.

9  Q.   Now, that information was obtained as a result of this

10  warrant that we've been talking about?

11  A.   Yes, sir.

12  Q.   Is that right?

13  A.   Yes, that's right.

14  Q.   So in the process of going through and doing Section B of

15  Attachment A to Exhibit 1 --

16  A.   Right, yes, sir.

17  Q.   -- that information was discovered; is that right?

18  A.   That's right.

19            **MR. PIMENTEL:** Thank you.

20            **MR. COMERFORD:** Judge, could we -- I would just -- I

21  guess I'll do it on redirect.  I want to object on the basis

22  that if he has personal knowledge of how that evidence was

23  obtained, but I can -- I think I can address it on -- one

24  question on redirect -- recross.

25            **MAGISTRATE JUDGE MCCARTHY:** Okay.

1             **MR. COMERFORD:** Thank you, Judge.

2                **RECROSS-EXAMINATION**

3     **BY MR. COMERFORD:**

4     Q.   What Mr. Pimentel asked you, I think, was about basically

5     whether agents were complying with part B?

6     A.   Yes, sir.

7     Q.   Is that fair to say?  And I believe you told us that you

8     reviewed some of the materials, but there were a number of

9     other people working on this?

10    A.   Right.

11    Q.   And that conversation with Ari's father wasn't one you

12    came up with?

13    A.   That's right.

14    Q.   So you don't personally know whether or not the agents,

15    the other people working on the case or the other analysts,

16    were necessarily complying with part B, particularly when they

17    came up with that conversation?

18    A.   So the way I came across that conversation that we're

19    referring to here is just through secondhand, through guys in

20    the office, guys on the squad and girls on the squad working

21    it now, that's right.

22            So I didn't -- I'm not the guy that was scrolling

23    through in the PDF file and discovered it and said, hey, I got

24    to call the AUSA, no.

25    Q.   Right.  So you can't say that whoever that person was was

complying with paragraph (b) because it wasn't you?

A.   I guess I don't understand the question, sir.  I'm not trying to be difficult.

Q.   That's all right, let me rephrase it.

A.   They're complying -- I guess, I mean, they know they have a search warrant that was obtained properly.  So, I mean, we do that all the time on search warrants.

    If my co-worker goes and obtains a search warrant for something in a house and I'm helping him with the execution of the warrant, I discover something, I'm still compliant with the search warrant.

    I'm probably getting into a hypothetical I don't need to be in, but I don't -- I don't...

Q.   If the -- if part B says -- I'm quoting here, the information to be seized consists of communications of any type -- you got that?

A.   Yes, sir.

Q.   -- (messages, videos, hyperlinks, photographs, et cetera), that would constitute providing material support to terrorists, that's the end of the quote.  If someone you work with is operating under that -- that premise and they see a conversation between Ari and his father that has nothing to do with providing material support to terrorists, do you have personal knowledge that that other agent was complying with part B when he seized that conversation or turned it over to

1  someone, or do you just not have knowledge of it?

2  A.   I guess -- I guess I'd be speculating whether they have

3  knowledge of it.  I mean --

4  Q.   Do you know for sure that that agent had read

5  paragraph (b) and knew exactly what the terms were of the

6  search warrant?

7  A.   Well, I know I sat down with those folks when we discussed

8  the case and said exactly what the Facebook search warrant was

9  for, what we were -- how we got the probable cause to search

10  it and what we presented.

11         But what they did with it after I was told by my

12  supervisor to go ahead and step off that case, no.  So if

13  you're saying, Randy, do you have personal -- I don't have

14  personal knowledge, no, sir, I don't.

15  Q.   Okay, thank you. That answers it.

16  A.   I'm sorry to be so difficult with that.  I wasn't trying

17  to...

18              **MR. COMERFORD:** Thank you.

19              **MR. PIMENTEL:** Judge, I'm going to clarify, if I

20  may?

21              **MAGISTRATE JUDGE MCCARTHY:** Let me just figure out

22  what this is.  This will now be re-redirect?

23              **MR. PIMENTEL:** Yes.

24              **MAGISTRATE JUDGE MCCARTHY:** Okay.

25                       **REDIRECT EXAMINATION**

1  **BY MR. PIMENTEL:**

2  Q.   All right, Special Agent Garver, you just referred now to

3  sitting down with your colleagues and discussing the search

4  warrant with them?

5  A.   Sure, yeah.

6  Q.   Could you recount that process for the Court?

7  A.   Sure.  I mean, from -- as to this case, it started we get

8  the search warrant return, there's a lot of material to go

9  through, and ultimately I had a different case that -- in

10  Buffalo anyway, was considered a priority investigation with

11  confidential human sources coming in from other field offices

12  and everything else.

13         So there were a lot of moving parts kind of in

14  my -- in my world.  So Greg Nelson, who is the supervisory

15  special agent told me, and I remember he told -- there were a

16  couple of us, it was after a meeting, he said here's what

17  we're gonna do, he says I want Randy to step off and give a

18  good hand over to these folks, let them know exactly where

19  we're going.

20         But at that point there was -- there was no

21  discussion at that point about anything regarding Social

22  Security or Government benefits.  I sat with them, I said

23  here's what we've got.  We have this lead, we talked to these

24  people, we developed this information.  I wrote the search

25  warrant.  We got it.  Here's the return, we started going

1  through it.  Betsy, the analyst, has really gone through it

2  significantly and we have -- this is kind of where it sits.

3          But, no, I mean, if the question is about Social

4  Security fraud or anything, no, there was no discussion of

5  that when --

6  Q.   No, I guess I'm speaking -- I'm talking more generally,

7  Special Agent Garver, with respect to complying with subpart

8  (b) of Attachment A.  Well, can you read that out loud?

9  A.   Sure.  This says law enforcement personnel -- is that what

10 you're talking about?

11 Q.   Yes.

12 A.   Attachment B?

13 Q.   Yes, Attachment A, paragraph (b).

14 A.   Paragraph (b), law enforcement personnel will thereafter

15 review all information and records received from the Facebook

16 Incorporated employees to determine the information to be

17 seized by law enforcement personnel.

18 Q.   Okay.  Stop there.  So that process then -- what's your

19 understanding of what that process requires?

20 A.   That we search -- take a look at what they give us and

21 make sure it's what is in the scope of the warrant.  Take a

22 look --

23 Q.   Everything that Facebook gives you?

24 A.   Sure, but make sure you don't have stuff that is not the

25 subject account.  Make sure you have stuff that isn't from

1  years and years ago because now we have a problem.

2  Q.   Okay. In other words, that it conforms, that the material

3  conforms --

4  A.   With Attachment B.

5  Q.   -- with paragraph (a)?

6  A.   Well, conforms with paragraph (a) and in particular with

7  Attachment B.

8  Q.   Okay.

9  A.   That what they give us is from the timeframe and of these

10 two guys' accounts.  We don't get someone else's stuff or we

11 don't get outside the dates.

12 Q.   Right.  In fact, you referred in your testimony earlier to

13 the dates that Magistrate Judge Schroeder had confined the

14 search to?

15 A.   Right.

16 Q.   And where was that?

17 A.   So on Attachment B we said from March 1st, 2013, until

18 present at the time of the warrant in November.

19 Q.   Okay. So you -- so in the process of going through --

20 doing the work contemplated by paragraph (b) of Attachment A,

21 you're making sure that that material conforms to

22 Attachment B?

23 A.   Yes.

24 Q.   And so the people that were reviewing the information,

25 your colleagues that were reviewing the information, had been

1  provided a copy of the warrant?

2  A.    Yes, yes.

3  Q.    So they knew the direction as well?

4  A.    Yes.

5  Q.    All right.  And then as you're reviewing all the

6  information that Facebook gives you, you are then making a

7  second determination as to what may comply or what may

8  constitute evidence of material -- providing material support

9  to terrorists?

10  A.    Right.

11  Q.    Now, in the process as an agent, is it your understanding

12  that if you see evidence of any other crimes you should take

13  any action?

14  A.    Yes.

15  Q.    And you're allowed to take action?

16  A.    Right.

17  Q.    Based on the fact that you have the material pursuant to

18  a -- what you presume to be a valid search warrant?

19  A.    Yes.

20  Q.    You believe to be a valid search warrant?

21  A.    Yes.

22  Q.    All right.  So in the process of doing that, the

23  information pertaining to Social Security was discovered?

24  A.    Yes, that's my understanding from the conversations after

25  I was no longer on the case.

1  Q.   Well, is there -- is there -- Special Agent Garver, is

2  there any other basis on which that material would have been

3  obtained?

4  A.   No.

5          **MR. COMERFORD:** Objection, Judge.  I think he

6  testified on recross that he doesn't have personal knowledge

7  of what exactly the other analysts or agents were doing.  I

8  think he can make the assumption that that's what they were

9  doing, but he can't -- he can't testify that he knows they

10  were complying with paragraph (b).

11          **MR. PIMENTEL:** Well, respectfully, that's not the

12  question.  The question isn't whether they were complying with

13  paragraph (b).

14          It's whether the material that was being reviewed

15  was obtained as a result of the Facebook search warrant.

16          **MAGISTRATE JUDGE MCCARTHY:** Seems to me that a lot

17  of this discussion is more properly reserved for post-hearing

18  argument.  I think the agent has said he doesn't, if I

19  understood him correctly -- and, sir, correct me if I'm

20  wrong -- you don't have personal knowledge of how that

21  information was discovered by another agent or investigator,

22  correct?

23          **THE WITNESS:** That's right, correct, yes, sir.

24          **MAGISTRATE JUDGE MCCARTHY:** You just heard from

25  somebody that it had been discovered, correct?

1          **THE WITNESS:** Yes, from this warrant, that's

2 correct, sir. Yes, Judge.

3 **BY MR. PIMENTEL:**

4 Q.   Is there any other basis on which the FBI office in

5 Buffalo obtained Facebook records of Ari Baum?

6 A.   No.

7 Q.   And you know that unequivocally?

8 A.   Yes.

9 Q.   So all of the information that was obtained from Facebook

10 by the FBI Buffalo office was obtained as a result of this

11 Facebook search warrant that you were the affiant on?

12 A.   Yes.

13 Q.   And there was no other basis to review that information

14 other than the search warrant?

15 A.   Yes.

16          **MR. PIMENTEL:** No further questions.

17          **MR. COMERFORD:** Nothing further, Judge.

18          **MAGISTRATE JUDGE MCCARTHY:** Thank you, sir, you may

19 step down.

20          **THE WITNESS:** Yes, sir.

21          (**WHEREUPON**, the witness was excused).

22          **MAGISTRATE JUDGE MCCARTHY:** Anything further?

23          **MR. PIMENTEL:** No.

24          **MR. COMERFORD:** Judge, I think what got us to this

25 hearing was our concerns about how the search warrant

1  information was reviewed in the context of what these charges

2  are, and how this information was turned over to Social

3  Security.

4           And I know Mr. Pimentel filed a memorandum about a

5  month ago before we scheduled this hearing, indicating Agent

6  Matt Hecker had contacted someone at Social Security I think

7  to have, you know, an understanding of how this material was

8  uncovered and how it was turned over to Social Security.

9           We should really hear from Agent Hecker just to

10  have a complete record on this.

11          **MR. PIMENTEL:** Judge, you know, I respect -- I

12  respect the position, but we are on a fishing expedition here.

13  The text -- the Court's text order says that the scope of the

14  hearing is to determine whether the agents acted reasonably in

15  relying on the November 21, 2013, search warrant.

16          We've established the process by which the search

17  warrant was obtained.  The search warrant, the application,

18  the U.S. Attorney's tacit endorsement of the search warrant is

19  all in evidence.

20          I don't know how -- what Special Agent Hecker or

21  Special Agent Torres from Social Security has to do with

22  reliance on the search warrant.  The search warrant speaks for

23  itself.  The agent who obtained the search warrant just

24  testified, subjected himself to cross-examination.

25          Agents who had nothing to do with obtaining the

1   search warrant or the material that was obtained as a result

2   of the search warrant were -- were -- I just can't see how

3   this is relevant to any sort of inquiry that the Court ought

4   to be doing.

5           **MAGISTRATE JUDGE MCCARTHY:** Well, all right. This

6   agent testified about obtaining the warrant.  There's also

7   testimony -- I'm reading from Attachment A, subparagraph (b)

8   to the search warrant says law enforcement personnel will

9   thereafter review all information and records received from

10  the Facebook employees to determine the information to be

11  seized by law enforcement personnel.

12          The information to be seized consists of

13  communications of any type (messages, videos, hyperlinks,

14  photographs, et cetera) that would constitute providing

15  material support to terrorists.

16          Now, this agent said he didn't seize that

17  information, that exchange with his father.  It's not clear

18  whether he even saw it.  I don't know.

19          But it seems to me that there still is an issue of

20  whether that information -- that exchange would have been

21  considered by somebody to be evidence of providing material

22  support to terrorists.

23          **MR. PIMENTEL:** But, Judge, that's not -- in a *Leon*

24  hearing, that's not the issue.  The issue is not whether the

25  material is evidence of providing material support to

1 │ terrorism.

2 │           It's whether the warrant was valid and whether

3 │ the --

4 │           **MAGISTRATE JUDGE MCCARTHY:** But I think part of the

5 │ *Leon* issue is whether the agents reasonably believed they were

6 │ complying with the warrant in their search, correct?

7 │           **MR. COMERFORD:** I think so, Judge.

8 │           **MAGISTRATE JUDGE MCCARTHY:** I thought you'd think

9 │ so, but I'm asking Mr. Pimentel.

10 │           **MR. COMERFORD:** I thought you were looking at me,

11 │ Judge, I apologize.

12 │           **MAGISTRATE JUDGE MCCARTHY:** No, no, that's all

13 │ right.

14 │           **MR. PIMENTEL:** Your Honor, I guess I can have a

15 │ parade of agents go up there and testify that I understood the

16 │ warrant was valid and I -- and I, you know, saw this

17 │ information as a result of doing what the warrant required me

18 │ to do, which is reviewing all of the information that was

19 │ obtained.

20 │           They have to -- they were authorized to review all

21 │ of the information that was obtained.  In the process of doing

22 │ that, they came across this evidence of another crime.

23 │ Period.  That's -- I don't understand why that's so

24 │ complicated.

25 │           **MAGISTRATE JUDGE MCCARTHY:** The warrant says the

1   only information that can be seized is information that would

2   constitute providing material support to terrorists.

3           **MR. PIMENTEL:** But it's plain view at that point,

4   Your Honor.  It's -- it's evidence that they obtained doing

5   what the warrant required them to do, which is review the

6   information.  That's a plain view issue at that point.

7           **MAGISTRATE JUDGE MCCARTHY:** Mr. Comerford.

8           **MR. PIMENTEL:** I don't even think we get to good

9   faith, but --

10          **MR. COMERFORD:** I think maybe we just take it up in

11  arguing this.  I believe the Government has a burden to meet

12  going forward and they've put on their witness, they can make

13  their argument.

14          We don't have any witnesses.

15          **MAGISTRATE JUDGE MCCARTHY:** All right, yeah, I think

16  at this point I'll hear what the parties have to offer by way

17  of post-hearing argument and we'll see where we go.

18          Now, just for the record, according to my notes,

19  Government Exhibits 1, 2 and 3 are in evidence.

20          Government Exhibit 4, which is the non-disclosure

21  order, was marked for identification, but it was not offered

22  in evidence and I don't know that it's directly relevant to

23  the hearing anyway so...

24          **MR. PIMENTEL:** I'll move it in.

25          **MR. COMERFORD:** No objection.

1          **MAGISTRATE JUDGE MCCARTHY:** All right, then

2     Government Exhibit 4 is also in.

3               (**WHEREUPON**, Government Exhibit 4 was received into

4     evidence).

5          **MAGISTRATE JUDGE MCCARTHY:** All right.

6          **MR. PIMENTEL:** Judge, I guess to be clear, I'm happy

7     to put on more -- more witnesses -- well, not happy about it.

8     I will do it if there's -- but I don't even -- I don't -- I

9     guess I feel like the goal post is moving, I'm chasing my tail

10    and I'm not really sure what I'm supposed to be doing, what

11    the burden of proof here is.

12         **MAGISTRATE JUDGE MCCARTHY:** Honestly, I want to

13    think about it a little more, too.  I guess what I would

14    suggest, counsel, before we formally close the hearing is that

15    you both give me, and it can be letter briefs, just in the

16    near future, you don't have to wait for the transcript or

17    anything I don't think, the issue of whether any further

18    testimony is relevant to this.

19              I understand your position, Mr. Pimentel.  And,

20    Mr. Comerford, I think I understand your position.  But just

21    so nobody is sandbagged at the end of the day, let's just air

22    that out a little bit and then I'll decide whether the hearing

23    needs to continue or not, okay?

24         **MR. COMERFORD:** Thank you, Judge.

25         **MAGISTRATE JUDGE MCCARTHY:** Your position I

1  understand, you're saying as long as they were looking at

2  information within the scope of the warrant.  If they happened

3  on something that -- that they saw in the context of that

4  search, then whether it relates to the investigation which was

5  the subject of the warrant or not, they can use it.

6           And you take a different view.

7           **MR. PIMENTEL:** Well, certainly we're not making any

8  argument -- and I hope this is plain -- that -- that the

9  Social Security -- the evidence of the Social Security fraud

10 has nothing to do with providing material support to

11 terrorism, we agree with that.

12          **MAGISTRATE JUDGE MCCARTHY:** You concede that.

13          **MR. PIMENTEL:** Yeah, sure.

14          **MAGISTRATE JUDGE MCCARTHY:** I thought so.

15          **MR. PIMENTEL:** Yeah.  I mean, I've even talked to

16 Mr. Comerford separately about, you know, at trial I don't

17 anticipate those terms -- I don't anticipate those terms even

18 coming up, you know, because that's not the scope of the case.

19          **MAGISTRATE JUDGE MCCARTHY:** Right.

20          **MR. PIMENTEL:** We get that.

21          **MAGISTRATE JUDGE MCCARTHY:** Right, right.

22          **MR. PIMENTEL:** But that doesn't vitiate the fact

23 that we had a valid warrant.  And it was obtained during the

24 process of executing that warrant and I don't --

25          **MAGISTRATE JUDGE MCCARTHY:** Mr. Pimentel , I

1   understand where you're coming from.  I just think it makes

2   sense to have --

3          **MR. PIMENTEL:** Sure.

4          **MAGISTRATE JUDGE MCCARTHY:** -- just some quick

5   briefing on that issue.  You tell me when -- when you -- how

6   much time you need to do that.

7          As to whether we need any additional witnesses,

8   Mr. Pimentel has indicated he'll make them available, if

9   necessary.

10         And then if we decide not, we can close the hearing

11  and you can do your -- your post-hearing briefs.  Or the

12  alternative, I guess, is that -- I mean, we can close the

13  hearing now, you can get the transcript, do your post-hearing

14  briefs and in the course of that you can argue that -- either

15  that further evidence is or is not necessary or that absent

16  that evidence, Mr. Comerford, you could argue that the

17  Government hasn't satisfied its burden of proof, but

18  Mr. Pimentel has offered, if necessary, to make the other

19  agents available.

20         So I'll go whichever way the parties wish to go,

21  but I think --

22         **MR. PIMENTEL:** I'd prefer the former, Judge.

23         **MAGISTRATE JUDGE MCCARTHY:** Okay.

24         **MR. PIMENTEL:** I'd like the Court to -- I mean, no

25  problem from the Government's perspective submitting , you

1  know, I guess what -- where we think we are.

2              **MAGISTRATE JUDGE MCCARTHY:** Yeah, yeah, all right.

3              **MR. PIMENTEL:** And advocating why we don't think a

4  hearing is necessary, but if the Court thinks that there are

5  further --

6              **MAGISTRATE JUDGE MCCARTHY:** You mean a continuation

7  of the hearing?

8              **MR. PIMENTEL:** Yeah, that's what I mean.

9              **MAGISTRATE JUDGE MCCARTHY:** Okay.

10             **MR. PIMENTEL:** You know, if the Court believes

11  otherwise, we'll certainly comply with that and --

12             **MAGISTRATE JUDGE MCCARTHY:** All right, okay.  So how

13  much time do the parties need to just brief that limited

14  issue?  And it can be by letter brief or whatever.

15             **MR. PIMENTEL:** Let's see, what's today?  Can we have

16  three weeks, Judge?

17             **MR. COMERFORD:** That's fine.

18             **MAGISTRATE JUDGE MCCARTHY:** Simultaneous exchange?

19             **MR. PIMENTEL:** Sure.

20             **MAGISTRATE JUDGE MCCARTHY:** All right. And then what

21  we'll do is I'll give you a date when we come back just to

22  wrap things up, then I'll either say the hearing should be

23  continued or it doesn't need to be continued.

24             And if that's the case, then you can order your

25  transcript and do your final post-hearing briefing to the

1   extent you consider it necessary, or maybe you'll say, hey,

2   this is the ballgame, but I'll give you that opportunity at

3   least.

4           **MR. PIMENTEL:** Okay.

5           **MAGISTRATE JUDGE MCCARTHY:** Okay, so then three

6   weeks -- today is September 27th.  So October 18th if you'll

7   have those briefs exchanged?

8           And then I will -- I'll give you a date we'll

9   reconvene just to address that issue.  I said October 18th.

10  How about --

11          **MR. COMERFORD:** Judge, Ms. Kubiak and I have a trial

12  October 27th.  So if we could get it before that?

13          **MAGISTRATE JUDGE MCCARTHY:** How about Monday,

14  October 24th?

15          **MR. COMERFORD:** Works for me, Judge.

16          **MAGISTRATE JUDGE MCCARTHY:** Wait a second, no, no,

17  no, that may not work for me.

18          How about Tuesday, October 25th at 9:30?  I have a

19  hearing starting at 10, but that should give us enough time.

20          **MR. PIMENTEL:** And that will be for status?

21          **MAGISTRATE JUDGE MCCARTHY:** Yeah, a status and at

22  that point I'll advise the parties whether additional

23  witnesses should be called.  And if so, we'll schedule that.

24          **MR. PIMENTEL:** All right.

25          **MAGISTRATE JUDGE MCCARTHY:** All right, counsel,

1   since the motion remains pending, would you please confirm

2   that on that basis time remains excluded through at least

3   October 25th, 2016, from the Speedy Trial Act calendar?

4               **MR. PIMENTEL:** Yes, Your Honor.

5               **MR. COMERFORD:** We do.

6               **MAGISTRATE JUDGE MCCARTHY:** Okay, thank you.

7   Anything further --

8               **MR. PIMENTEL:** Thank you.

9               **MAGISTRATE JUDGE MCCARTHY:** -- to address today?

10              **MR. COMERFORD:** No, Your Honor.

11              **MR. PIMENTEL:** No.

12              **MAGISTRATE JUDGE MCCARTHY:** Okay, thank you, all.

13              (**WHEREUPON**, the proceedings adjourned at 10:36 a.m.)

14                          *   *   *

15              **CERTIFICATE OF TRANSCRIBER**

16

17          In accordance with 28, U.S.C., 753(b), I certify that

18  this is a true and correct record of proceedings from the

19  official electronic sound recording of the proceedings in the

20  United States District Court for the Western District of New

21  York before the Honorable Jeremiah J. McCarthy on September

22  27th, 2016.

23

24  S/ Christi A. Macri

25  Christi A. Macri, FAPR-CRR
    Official Court Reporter