UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,            **REPORT, RECOMMENDATION and ORDER**

v.

ARI ELIAS BAUM,                  14-CR-164-WMS-JJM

                 Defendant.
_____

      Defendant Ari Baum is charged in a four-count Indictment [16][1] with making a

false statement for use in determining Supplemental Security Income ("SSI") benefits, in

violation of 42 U.S.C. §1383a(a)(2), SSI fraud, in violation of 42 U.S.C. §1383a(a)(3), theft of

government property, in violation of 18 U.S.C. §641, and making a material false statement in

support of his application for SSI benefits, in violation of 18 U.S.C. §1001(a)(2).  Before me are

the remaining portions of defendant's pretrial motion [38],[2] as well as the government's cross-

motion for reciprocal discovery.  Government's Response [39], ¶II(K), pp. 22-23 of 23. Oral

argument was initially held on May 7 and July 17, 2015 [43, 51], and further oral argument was

held in abeyance by agreement of the parties pending the Second Circuit's decision in its *en banc*

reconsideration of United States v. Ganais, 755 F.3d 125 (2d Cir. 2014) ("Ganias I") [52, 53, 57,

59, 61].

      Following that decision, the parties submitted additional briefs [63, 65] and oral

argument concerning defendant's motion to suppress the Facebook evidence ([38], ¶I) was held

on July 13, 2016 [64, 66].  At that time, I directed the parties to make additional submissions

[67], and upon consideration of those submissions [68, 69, 71], I scheduled an evidentiary

---

[1]      Bracketed references are to the CM/ECF docket entries.

[2]      At the July 17, 2015 oral argument, the parties agreed that defendant's motion to suppress statements was resolved [51].

hearing to address the government's reliance on the good-faith exception of United States v. Leon, 468 U.S. 897 (1984) [73]. Thereafter, the parties submitted their post-hearing briefs [85, 87, 90, 91], and oral argument was held on February 14, 2017 [93].

For the following reasons, defendant's motions for non-dispositive relief are granted in part and denied in part, and the government's cross-motion for reciprocal discovery is granted. I further recommend that defendant's motions to suppress the Facebook evidence and to dismiss the Indictment be denied.

## BACKGROUND

The charges against defendant stem from his alleged improper collection of SSI benefits based upon his false statements to the Social Security Administration ("SSA") that he had not been outside of the United States for 30 consecutive days since March 1, 2013. Indictment [16]. The evidence that the government will seek to introduce against defendant at trial includes a private message that he exchanged with his father, R. Bruce Baum, on April 7, 2013 using Facebook in which, in response to his father asking "How is your money holding out"?, he stated "life is cheaper here but I will lose the ssi eventually if I stay here because they will find out that I am out of the country" [69-2], pp. 3-4 of 4.

That message was allegedly obtained by the government from a December 4, 2013 search and seizure warrant [38-1] issued by Magistrate Judge H. Kenneth Schroeder, Jr. for Facebook accounts associated with usernames "ari.baum1" and "mnds.yabroody". The warrant was supported by the Affidavit of FBI Special Agent ("SA") Randall Garver [38-1]. Distinct from the present charges against defendant, the search warrant was issued to investigate him for allegedly providing material support to terrorists, in violation of 18 U.S.C. §2339A.

Defendant moves to suppress the private Facebook messages on the grounds that the search warrant was not supported by probable cause and was overbroad.  Comerford Affirmation [38], ¶¶3-8; July 13, 2016 Text Order [67]; Baum Affidavit of Standing [68], ¶4. The government disputes that the search warrant was deficient, but argues that even it was, suppression is not warranted, since law enforcement reasonably relied upon it and it was discovered in plain view.  Government's Responses [39], pp. 3-9; [65], pp. 3-4.

After the parties' initial briefing on these issues, I directed the government to "provide an explanation as to how the materials obtained from the search warrant came to be used in this case".  July 13, 2016 Text Order [67].  In response, the government submitted a Report of Investigation from Social Security Administration ("SSA") SA Joan Torres [69-1], which stated that on February 4, 2014 FBI SA Matthew Hecker contacted the SSA Office of the Inspector General and requested assistance regarding the ongoing investigation of defendant. "SA Heckler advised that [defendant] was currently under investigation for possible terrorist ties/suspicious foreign travel and believed to be receiving [SSI] from the SSA while being outside of the country for 30 days or longer".  Id., pp. 2-3 of 6.  On March 7, 2014, SA Torres met with FBI SAs Hecker and Keith Bender and Assistant United States Attorney ("AUSA") Paul Campana.  Id., p. 4 of 6.  During that meeting, the FBI informed the SSA that during the course of executing a search warrant on defendant's Facebook account, it discovered the April 7, 2013 message between defendant and his father.  Id.  At that time, AUSA Campana requested that SA Torres draft an affidavit in support of a Criminal Complaint charging defendant with theft of government funds.  Id.  The subject message was later e-mailed by the FBI to SA Torres on March 10, 2014.  Id.

-3-

Following the government's submission of the Investigative Report, an evidentiary hearing was conducted on September 27, 2016, "limited to whether the agents acted reasonably in relying on the November 21, 2013 search warrant for defendant's Facebook account ([38-1], pp. 1-32 of 33) in conducting their search which led to the discovery of the private messages defendant seeks to suppress". August 12, 2016 Text Order [73]. SA Garver testified on behalf of the government that he was initially assigned to investigate defendant after two people in Buffalo reported to the FBI that he made statements that caused them concern. Hearing transcript [81], pp. 9-10. As part of that investigation, SA Garver viewed defendant's Facebook page, which was publicly assessable at the time, and eventually met with AUSA Campana to obtain a search warrant. Id., pp. 10-12. SA Garver prepared a draft affidavit in support of the search warrant application and submitted it to AUSA Campana, who agreed that the application was supported by probable cause, and decided that it would be presented to the court. Id., pp. 12, 13, 20. Since SA Garver did not attend law school and only received some legal training at the FBI Academy, he relied upon the United States Attorney's Office for legal advice. Id., p. 19. He testified that he had no basis to believe that there was anything wrong with the search warrant. Id.

When Facebook responded to the search warrant, SA Garver had a meeting with his colleagues before the review began and "discussed the case and said exactly what the Facebook search warrant was for". Id., pp. 35-37. Copies of the search warrant were also provided to the individuals reviewing the information. Id., pp. 20, 38-39. At that point, there were no discussions about defendant's Social Security benefits. Id., p. 36.

SA Garver also understood that he was permitted to seize evidence of any other crimes that was discovered during the execution of the search warrant. Id., p. 39. He estimated

that it took several months to review the information to determine whether there was evidence of providing material support to terrorists.  Id., pp. 21-22.  Even information that was not relevant to the crime of providing material support to terrorists was retained by the FBI, because everything produced by Facebook is "all on one electronic document".  Id., p. 25.  SA Garver was aware from his prior experience that Facebook would not produce isolated communications to avoid acting as an agent of law enforcement.  Id., pp. 27-28.

SA Hecker took over the case from SA Garver, who was reassigned to a different investigation, prior to the discovery of the subject message.  Id., pp. 25-26, 30.  SA Garver recalled others in the squad area later telling him in an unofficial capacity about the discovery of the message (id., pp. 28-29, 32), but conceded that he lacked personal knowledge as to how it became part of the investigation.  Id., pp. 29, 33-35.

Following the September 27, 2016 hearing [81], the parties agreed that no further testimony was necessary [80] and submitted their post-hearing briefs [85, 87, 90, 91].

## ANALYSIS

A.    **Defendant's Motions**

1.    **Motion to Suppress**

a.    **Defendant's Standing**

At the outset, "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."  Rakas v. Illinois, 439 U.S. 128, 132 n.1 (1978).  "Whether the Fourth Amendment precludes the Government from viewing a Facebook user's profile absent a showing of probable cause depends, *inter alia*, on the user's privacy settings.  When a social media user disseminates

his postings and information to the public, they are not protected by the Fourth Amendment. However, postings using more secure privacy settings reflect the user's intent to preserve information as private and may be constitutionally protected."  United States v. Meregildo, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012).

Evidencing defendant's intention to preserve the privacy of the seized messages, he has submitted an Affidavit of Standing [68] stating that the messages could only be viewed on Facebook by him and the sender/recipient of each message.  Id., ¶3.  This is sufficient to confer standing on him to challenge the search warrant.  *See* United States v. DiTomasso, 56 F. Supp. 3d 584, 592 (S.D.N.Y. 2014) (holding that the defendant had an expectation of privacy in e-mail correspondence and one-on-one electronic chats); In re Applications for Search Warrants for Info. Associated with Target Email Accounts/Skype Accounts, 2013 WL 4647554, *4 (D. Kan. 2013) ("an individual has a reasonable expectation of privacy in emails stored with, sent to, or received thorough an electronic communications service provider").[3]

Recognizing that "[i]t is to the holdings of . . . cases, rather than their dicta, that we must attend" Kokkonen v. Guardian Life Insurance Co. of America, 511 U.S. 375, 379 (1994),  the government's reliance on United States v. Lifshitz, 369 F.3d 173, 175 (2d Cir. 2004) does not compel a different conclusion, since it addressed a distinct issue: "This case considers whether a computer monitoring condition imposed upon a probationer infringes upon his Fourth Amendment right to be free of unreasonable searches".  Thus, it was only in *dicta* that the

---

[3]    *But see* United States v. Bazar, 2015 WL 6396011, *1 (S.D. Cal.  2015) ("[w]hile it is common experience that email accounts may be password protected, they may also be shared, while Facebook accounts are to various degrees open to viewing by anyone with an internet connection. Both types of digital accounts are probably viewable by employees of Google, Inc. and Facebook, Inc. which offer the accounts freely to the public. Consequently, the defendant has not made out a case for suppressing evidence from these sources even if no warrants had issued (in other words, he has not established 'standing' in the Fourth Amendment sense)").

Second Circuit stated that "[i]ndividuals generally possess a reasonable expectation of privacy in their home computers. . . . They may not, however, enjoy such an expectation of privacy in transmissions over the Internet or e-mail that have already arrived at the recipient." Id., 190. In any event, even it was not *dicta*, "[t]he court in Lifshitz . . .  did not apply the typical Fourth Amendment standards because that case involved search terms imposed on a probationer, and probationers have significantly diminished privacy expectations.  Thus, . . . Lifshitz provides this court little guidance under the circumstance presented here."  In re U.S. for an Order Authorizing the Release of Historical Cell-Site Information, 809 F. Supp. 2d 113, 125 n. 4 (E.D.N.Y. 2011).

### b.    Probable Cause

"The task of the issuing magistrate [in assessing probable cause] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . .  there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."  Id., 238-39.  "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts."  Id., 236. "[C]ourts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a common sense, manner".  Id.  "[S]o long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more".  Id. However, "his action cannot be a mere ratification of the bare conclusions of others".  Id., 239.

The Affidavit of SA Garver submitted in support of the search warrant contained the following relevant information:

- -    In 2010, the FBI received information from an undisclosed source that defendant was suspected of receiving training in an unspecified terrorist training camp while traveling in the Middle East. These allegations were investigated, but could not be substantiated. Garver Affidavit [38-1], ¶22;

- -    In May 2011, shortly after Usama bin Laden's death, a restaurant manager called the FBI and reported that defendant told a waitress that he was having his last meal and asked if he could leave his panel truck in the restaurant's parking lot. However, the waitress later "backed away" from her original statement (id., ¶23);

- -    In 2011, defendant's cellular telephone was searched, which revealed a text-message from an unspecified individual on April 23, 2011 stating: "Jesus rose again today . . ha. . ha. . ha. I heard you are being trained for being used as a terrorist" (id., ¶26);

- -    In March of 2013, Sources 1 and 2 stated that in February 2013 defendant stated several times, "I am not afraid to die. Death is the greatest gift (one can give)" (id., ¶28), and told them that he had recently returned from Syria (id.). By contrast, in April of 2013 Source 3 stated that defendant was "a devout Muslim . . . fixated on converting family and friends to Islam", but did "not believe [defendant to be] dangerous" or to "pose a threat to national security" (id., ¶30). Source 3 also stated that defendant was diagnosed as bi-polar, but had not taken medication in several years (id.);

- -    In June 2013, SA Garver interviewed Source 4, who told him that defendant's posts on Facebook were becoming "more 'extreme, aggressive, and concerning'

regarding religion", and believed that he "could be a danger (threat to national security)" (id., ¶31);

- - In July 2013, defendant shared a picture on Facebook of a man and woman sitting at a table, dressed in military attire and holding weapons, with the caption "husband and wife fighting for Islam!". Defendant commented on Facebook - "the most beautiful photos I have ever seen!!!" (id., ¶34);

- - From May through August 2013 defendant traveled to Morocco, Egypt, Turkey, United Arab Emirates, and France (id., ¶35). In August 2013, defendant told Source 4 that he was attempting to return to the United States from overseas, but was having difficulty doing so because he was on the no-fly list. Source 4 noticed that defendant's Facebook status was listed as "too dangerous to fly" (id., ¶33);

- - When defendant returned to the United States in August 2013, he was interviewed by US Customs and Border Protection, and stated that in March 2013 he flew to Casablanca, Morocco to "study", but later in the interview said that he did not study in Morocco and could not name the University where he attempted to study. Defendant further stated that he attempted to enter Yemen to see a friend that he met on a previous trip to Yemen in 2008, but would not provide the name of that individual, who he identified as one of his Facebook friends (id., ¶36); and

- - In September of 2013, user name "mnds.yabroody (and further named 'Sniper from Yabroud (Abu Malik))", a Facebook friend of defendant, "came to the attention of the FBI" (id., ¶37).[4] Yabroody's profile picture on Facebook page showed "an individual aiming a rifle" with photographs of terrorist leaders in the background. He identified his work and

---

[4]     The individual using this Facebook page is identified by defendant as "Yabroody". Comerford Affirmation [38], ¶8.

education as "Jihad for the cause of God" and "Sniper", and identified his likes as including the al-Qaeda affiliate, Islamic State of Iraq and Levant (id., ¶¶3, 37-39).   In August 2013, Yabroody made posts which SA Garver interpreted as him "wishing to attack western targets when his group is capable" (id., ¶43).  The FBI assessed that Yabroody's Facebook page was "affiliated with, 'follows,' or 'likes' with various al Qaeda-affiliated groups" (id., ¶46).[5]

Defendant argues that SA Garver's supporting affidavit consists only of "religious and political speech, travel to foreign countries, and 'friending' someone on Facebook",  and that there was "no indication that he ever threatened anyone . . . committed any crimes, or . . . associated with any 'terrorists' beyond 'friending' an unidentified person on Facebook who posted inflammatory content."  Comerford Affirmation [38], ¶5.  This understates the content of SA Garver's supporting affidavit.

Demonstrating that defendant's conduct transcended lawful religious proselytizing of Islam, SA Garver stated that on Facebook defendant was friends with an individual who maintained a Facebook page believed to be affiliated with various al Qaeda– affiliated groups and had made posts wishing for attacks against western targets.  Garver Affidavit [86-1], ¶¶37, 43, 46.  Suggesting that defendant may have had similar beliefs, two individuals disclosed to law enforcement that in March 2013 defendant expressed a "willingness to die for a cause he believed in, as there is no greater glory to Allah" and stated that he had recently returned from Syria.  Id., ¶¶27- 28.  A 2011 text message discovered on defendant's cell phone from an unidentified individual likewise read: "I heard you are being trained for being used as a terrorist".   Id., ¶26.  Defendant also posted on his Facebook page a photo of an armed man and woman in military attire captioned "husband and wife fighting for Islam!", and

---

[5]      In September 2013 defendant restricted access to the content on his Facebook page, which necessitated the search warrant.  Garver Affidavit [38-1], ¶47.

commented that it was "the most beautiful photos I have ever seen!!!".  Id., ¶34.   When these facts are coupled with his recent foreign travel and the evasive answers he provided about that travel upon his return to the United States (id., ¶36), I conclude that there was sufficient probable cause to support a search for evidence related to providing material support to terrorists, in violation of 18 U.S.C. §2339A, whether in communications with Yabroody or others.

### c.      Overbreadth and Particularity

The Fourth Amendment "requires particularity and forbids overbreadth . . . . Although somewhat similar in focus, these are two distinct legal issues: (1) whether the items listed as 'to be seized' in the warrant were overbroad because they lacked probable cause and (2) whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers."  United States v. Zemlyansky, 945 F.Supp.2d 438, 450 (S.D.N.Y. 2013).  See United States v. Cohan, 628 F.Supp.2d 355, 359 (E.D.N.Y. 2009) (a search warrant can be "unconstitutionally infirm in two conceptually distinct but related ways: either by seeking specific material as to which no probable cause exists, or by giving so vague a description of the material sought so as to impose no meaningful boundaries").

The search warrant stated that the Facebook accounts "ari.baum1" and "mnds.yabroody" were "believed to conceal (. . . . describe the property to be seized):  See attached Schedule of Items to be Seized, attached hereto as Exhibit A, and incorporated herein by reference, all of which constitute fruits, evidence and instrumentalities of violations of [18 U.S.C.] Section 2339A".[6]  Although there was no Exhibit A to the search warrant, Attachment A of the search warrant was captioned "List of Items to be Seized", and stated the following:

---

[6]      The search warrant did not reference Attachment B (see [38-1], p. 1 of 33), which followed Attachment A and was captioned "Particular Description". It stated that the information from the Facebook accounts was from the period of March 1, 2013 to present.  Id., p. 4 of 33.

A.      The search warrant will be presented to Facebook, Inc.
personnel who will be directed to isolate the accounts . . . [and]
create an exact duplicate of the accounts . . . . including an exact
duplicate of all information stored in the . . . accounts and files
described therein.

a.      All contact information . . . .

b.      . . . all photos . . . .

c.      . . . . status updates; links to videos, photographs,
articles, and other items; Notes; Wall postings, friend lists . . . ,
groups and networks of which the user is a member . . . ; future and
past event postings; rejected 'Friend' requests; comments; gifts;
pokes; tags; and information about the user's access and use of
Facebook applications . . . .

d.      All other communications and messages made or received
by the user . . . .

e.      All IP logs . . . .

f.      All information about the user's access . . . .

g.      The length of service . . . the types of service utilized . . .
and the means and source of any payments associated with the
service . . . .

h.      All privacy settings and other account settings.

i.      All records pertaining to communications between
Facebook and any person regarding the user or the user's Facebook
account . . . .

B.      Law enforcement personnel will thereafter review all
information and records received from . . . Facebook Inc. . . . to
determine the information to be seized by law enforcement
personnel.  The information to be seized consists of
communications of any type . . . that would constitute Providing
Material Support to Terrorists".

Defendant argues that the search warrant "was overbroad because it permitted the

seizure of all communications on [his] Facebook account, and was not limited to those

communications with the suspected terrorist [Yabrooud]".  Defendant's Reply [42], pp. 1-2.  He

-12-

further argues that by authorizing "an unbridled, exploratory search of [his] Facebook account",
it was a constitutionally impermissible general search.  Defendant's supplemental letter
submission [47], p. 3 of 4.  Although characterized by defendant as only challenges to
overbreadth, he also appears to challenge particularity.  *See* United States v. Costin, 2006 WL
2522377, *7 n. 8 (D. Conn. 2006) ("some courts have also used th[e] term [overbreadth], more
generally, to describe a lack of particularity").  Therefore, I will address both concepts.

### i.        Overbreadth

Defendant argues that the search warrant was overbroad because it "should have
been limited to communications between [him] and Yabroody, not [him] and everyone he
communicated with on Facebook".  Defendant's Reply [42], pp. 1-2.  Defendant takes too
narrow a read of SA Garver's Affidavit, which was not so limited as to only establish probable
cause that the communications between defendant and Yabroody would yield evidence of
providing material support to terrorists. *See* United States v. McDarrah, 351 Fed. App'x 558, 561
(2d Cir. 2009) (Summary Order) ("[t]he magistrate judge . . . had a 'substantial basis' to
conclude that a search of the messages in McDarrah's account other than those between him and
'Julie' or 'David Smith' would 'uncover evidence of wrongdoing.' Furthermore, a warrant need
not be limited to a location where the conduct amounting to evidence of wrongdoing - such as
the emails between McDarrah and 'Julie' -  has already been uncovered, as long as there is a
sound basis to conclude that evidence of wrongdoing may be found in additional specified
locations"); United States v. Hanna, 661 F.3d 271, 287 (6th Cir. 2011) ("limiting the search to
particular senders and recipients of e-mail would hamper the search for evidence tying
defendants to illegal trade with Iraq").

In support of his argument that the search warrant was overbroad, defendant also relies on testimony elicited from SA Garver at the evidentiary hearing concerning the government's reliance on the <u>Leon</u> good-faith exception.  Vogelbaum Affirmation [87], p. 5. Specifically, he relies on the following exchange:

> "Q.  And there was no reason to believe that [defendant's] conversations with his father would have anything to do with material support to terrorism?
>
> A.   No, not to my knowledge" [81], pp. 29-30.

Defendant argues that this testimony "established that the FBI had no compunction about searching the materials it knows it lacks a legal justification to examine".  Vogelbaum Affirmation [87], p. 5.

I disagree.  "Where proof of wrongdoing depends upon documents . . . . whose precise nature cannot be known in advance, law enforcement officers must be afforded the leeway to wade through a potential morass of information in the target location to find the particular evidence which is properly specified in the warrant".  <u>United States v. Scarfo</u>, 180 F. Supp. 2d 572, 578 (D.N.J. 2001).  *See also* <u>United States v. Schesso</u>, 730 F.3d 1040, 1046 (9th Cir. 2013) ("[t]he government was faced with the challenge of searching for digital data that was not limited to a specific, known file or set of files. The government had no way of knowing which or how many illicit files there might be or where they might be stored"); <u>United States v. Burdulis</u>, 2011 WL 1898941, *5 (D. Mass. 2011), <u>aff'd</u>, 753 F.3d 255 (1st Cir. 2014) ("warrant authorizing seizure of a suspect's home computer equipment and digital storage media for later off-site electronic search is not overbroad or unreasonable, as long as the probable-cause showing in the warrant application demonstrates a 'sufficient chance of finding some needles in the computer haystack'").  Thus, it is "well-established that a search warrant can properly permit

-14-

the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government". In the Matter of a Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx gmail.com Maintained at Premises Controlled By Google, Inc., 33 F. Supp. 3d 386, 393 (S.D.N.Y. 2014).

Here, there is nothing in the record to suggest that law enforcement knew that defendant was communicating privately with his father or any other specific individuals until executing the search warrant. Even if that were not so, the Fourth Amendment does not "require the executing authorities to delegate a pre-screening function to the internet service provider". United States v. Bowen, 689 F. Supp. 2d 675, 682 (S.D.N.Y. 2010), aff'd., 490 Fed. App'x 363 (2d Cir. 2012) (Summary Order). *See also* In the Matter of a Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx gmail.com Maintained at Premises Controlled By Google, Inc., 33 F. Supp. 3d at 394 ("it is unrealistic to believe that Google or any other email host could be expected to produce the materials responsive to categories listed in a search warrant"). Therefore, I conclude the search warrant was not overbroad.

### ii.    Particularity

"[T]he Fourth Amendment protects against 'wide-ranging exploratory searches' unsupported by probable cause by mandating that a search warrant describe with particularity the place to be searched and the persons or things to be seized". United States v. Rosa, 626 F.3d 56, 61 (2d Cir. 2010) (*quoting* Maryland v. Garrison, 480 U.S. 79, 84 (1987)). "General warrants of course, are prohibited by the Fourth Amendment." Andresen v. Maryland, 427 U.S. 463, 480 (1976). "In order to prevent a 'wide-ranging exploratory search,' . . . the warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the

magistrate has authorized him to seize." United States v. George, 975 F.2d 72, 75 (2d Cir. 1992) (*quoting* Garrison, 480 U.S. at 84). The requirement of particularity is satisfied where the warrant: (1) identifies "the specific offense for which the police have established probable cause"; (2) "describe[s] the place to be searched"; and, (3) specifies "the items to be seized by their relation to designated crimes". United States v. Galpin, 720 F.3d 436, 445–46 (2d Cir. 2013).

"[T]he particularity requirement is not so exacting as to eliminate all discretion of the executing officers". United States v. Longo, 70 F.Supp.2d 225, 250-51 (W.D.N.Y. 1999) (Skretny, J.) (*citing* United States v. Riley, 906 F.2d 841, 844 (2d Cir.1990)). Indeed, "[t]he fact that the warrant called for seizure of a broad array of items does not, in and of itself, prove that the warrant fails to meet this requirement of particularity." United States v. Sugar, 606 F. Supp. 1134, 1151 (S.D.N.Y. 1985). "Courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant." United States v. Young, 745 F.2d 733, 759 (2d Cir. 1984). "The particularity requirement assumes greater importance where the property to be searched involves electronic data stored in a computer hard drive or its equivalent." United States v. Nguyen, 2014 WL 1512030, *15, adopted, 2014 WL 1795045 (W.D.N.Y. 2014).

Defendant raises several argument as to why the search was not sufficiently particularized. First, he argues that the search warrant evidence should be suppressed because the search warrant "permitted the seizure of all communication on [his] Facebook account". Defendant's Reply [42], p. 1. I disagree. "It is certainly true that in order to search for the

specified items, the Warrants sought to seize the entirety of . . . the Facebook account . . . . But

this does not transform the warrants into general warrants. Indeed, it is important not to confuse

the separate concepts of the seizure of an item - which were quite specifically identified but

which were seized in their entirety - with the search itself." United States v. Ulbricht, 2014 WL

5090039, *14 (S.D.N.Y. 2014). *See* United States v. Scully, 108 F. Supp. 3d 59, 95 (E.D.N.Y.

2015) ("every case of which we are aware that has entertained a suppression motion relating to

the search of an email account has upheld the Government's ability to obtain the entire contents

of the email account to determine which particular emails come within the search warrant").

Indeed, as the government notes (government's Reply Memorandum [90], p. 4), the 2009

Advisory Committee Notes to Fed. R. Crim. P. ("Rule") 41 explain that Rule 41(e)(2)

"acknowledges the need for a two step process: officers may seize or copy the entire storage

medium and review it later to determine what electronically stored information falls within the

scope of the warrant".

      Second, defendant argues that the search warrant permitted a constitutionally

impermissible general search. Defendant's supplemental letter submission [47], pp. 2-3 of 4.

However, paragraph B of Attachment A restricted law enforcement to only searching for and

seizing communications constituting evidence of providing material support to terrorists, in

violation of 18 U.S.C. §2339A, thereby preventing a general search, in violation of the Fourth

Amendment's particularity requirement. *See* United States v. Scouten, 2015 WL 3756357, *1

(W.D.N.Y. 2015) (Skretny, J.) ("Attachment B sufficiently limited the scope of the search of

computers or other data storage to files, images, and correspondence related to the specified

crimes of distribution and possession of child pornography"); United States v. Sharp, 2015 WL

4644348, *10 (N.D. Ga. 2015) ("[b]ecause the Facebook search warrant authorized the searching

agents to review the information obtained from Sharp's Facebook accounts for evidence relevant to copyright infringement and unauthorized circumvention of digital access controls . . . it did not allow a 'general, exploratory rummaging' in violation of the Fourth Amendment's particularity requirement"); Scully, 108 F. Supp. 3d at 92 ("by specifically identifying the statutes and conduct that gave rise to the search and seizure, the Search Warrant sufficiently identified the suspected crimes for which there was probable cause, and which the materials to be seized evidenced"). *See also* United States v. Lake, 233 F. Supp. 2d 465, 471 (E.D.N.Y. 2002) ("generic terms may be used to describe the materials to be seized so long as the warrant identifies a specific illegal activity to which the item related").

Finally, defendant argues that "the government's theory would authorize law enforcement, having demonstrated probable cause to believe that a tractor was stolen and obtained a search warrant for a barn, to conduct a search of the horses' feedbags for the heisted farm vehicle". Vogelbaum Affirmation [87], pp. 3-4. This argument likewise misses the mark. It is well settled that "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found . . . . Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found." United States v. Ross, 456 U.S. 798, 820–21 (1982). While this principle would preclude law enforcement from searching the feedbags for the presumably much larger stolen tractor, it does not bar the search here.

"[A] warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category. But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'" Riley, 906

F.2d at 845.  *See also* Andresen, 427 U.S. at 482 n. 11 ("there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized").  "The process of retrieving electronic data and reviewing same is no different than seizing multiple file cabinets containing voluminous files or records." United States v. Chopra, 2014 WL 6810564, *13 (W.D.N.Y. 2014).  "The . . .  search does not fail to satisfy the particularity requirement simply because the warrant does not specify a more precise . . . search method."  United States v. Taylor, 764 F. Supp. 2d 230, 237 (D. Maine 2011). Therefore, I conclude that the search warrant did not lack sufficient particularization.


### d.    Leon **Good-Faith**

Even if the search warrant lacked probable cause, was overbroad or insufficiently particularized, I would still conclude that suppression is not warranted under the Leon good-faith exception. Suppression is to be the "last resort, not [the court's] first impulse".  Herring v. United States, 555 U.S. 135, 140 (2009).  "Thus, in United States v. Leon, the Supreme Court recognized an exception to the exclusionary rule for 'evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant.'"  United States v. Clark, 638 F.3d 89, 99 (2d Cir. 2011) (*quoting* Leon, 468 U.S. at 922).

"The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance' on an invalidated warrant . . . . In assessing whether it has carried that burden, we are mindful that . . . that most searches conducted pursuant to a warrant would likely fall within its protection."  Id., 100.  "[A]gainst this presumption of

reasonableness", four circumstances have been identified where the good faith presumption of reasonableness will not apply to preserve evidence from suppression: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." Id. In addition to warrants lacking probable cause, "[t]he Leon good faith exception has been applied when a warrant lacked particularity . . . or improperly authorized a 'general warrant'". United States v. Smith, 2007 WL 2088938, *5 (W.D.N.Y. 2007).

In his initial post-hearing submission, defendant relied on the first and third circumstances. Vogelbaum Affirmation [87], pp. 8-9. However, in his post-hearing reply, he "adds that, if the warrant is construed as the government would like, so that it authorized an indiscriminate search of the whole of [his] Facebook account for Material Support, then reliance on the warrant was objectively unreasonable because Judge Schroeder must merely have rubber-stamped a probable cause showing insufficient to justify the extensive search he authorized". Vogelbaum Affirmation [91], pp. 10-11. I will address each of these individually.

### i.    Was Magistrate Judge Schroeder Knowingly Misled?

"Suppression . . . remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." Leon, 468 U.S. at 923 (citing Franks v. Delaware, 438 U.S. 154, 155–56, (1978)).   Franks requires that a defendant make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant

affidavit". Franks, 438 U.S. at 155–56. "Omissions from an affidavit that are claimed to be material are governed by the same rules." United States v. Ferguson, 758 F.2d 843, 848 (2d Cir. 1985). "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000).

Relying on SA Garver's testimony that he did not have any reason to believe that the communications between defendant and his father related to providing materials support to terrorists ([81], pp. 29-30), defendant argues that "[e]ven if it was truly impracticable to garner Facebook's compliance with a targeted warrant request tailored to the probable cause the [FBI] actually possessed there was no reason the FBI could not have informed Judge Schroeder that it lacked probable cause with respect to specific communications, including those between [defendant] and his father", and had they done so "Judge Schroder might have . . . confined the FBI's review . . . to areas in which probable cause existed to believe evidence of Material Support might be found". Vogelbaum Affirmation [87], p. 8. However, as discussed above, there is nothing in the record to establish that the agents even knew that defendant was communicating with his father or other specific individuals privately via Facebook before executing the search warrant. Thus, he has failed to make a substantial preliminary showing that any false statements were knowingly and intentionally made in the search warrant application.

### ii.    Did Magistrate Judge Schroeder Abandon his Judicial Role?

"[T]he law will not hastily assume a magistrate's surrender of his judicial independence to the police or prosecution." Clark, 638 F.3d at 101. Thus, "abandonment of judicial neutrality and detachment properly cannot be inferred from the fact that the magistrate committed legal error in his assessment of probable cause". Id. Even if the warrant was infirm,

defendant offers no basis whatsoever for demonstrating that any error was the result of an abandonment of judicial responsibilities.

### iii. Was the Application So Lacking in Probable Cause as to Render Reliance upon it Unreasonable?

This circumstance "frequently arises when affidavits are bare bones, *i.e.,* totally devoid of factual circumstances to support conclusory allegations". <u>Clark</u>, 638 F.3d at 103. However, "[a]t the opposite end of the spectrum are cases in which a defective warrant issued based on an affidavit providing detailed factual allegations in support of probable cause. Such cases almost invariably demonstrate reasonable reliance". <u>Id</u>. Since at worst, the question of whether SA Garver's Affidavit established probable cause for the search warrant presents a close call, I conclude that reliance upon the search warrant was not unreasonable.

### e. Duration of the Seizure

Defendant alleges that although the FBI received the materials from Facebook responsive to the search warrant on December 12, 2013, it was not until March 7, 2014 that it brought the subject message to the attention of the SSA. Vogelbaum Affirmation [87], p. 10.[7] Relying on <u>Ganias I</u>, defendant argues that the protracted retention of the subject message without obtaining a second search warrant to seize it violates the Fourth Amendment. <u>Id</u>., pp. 9-10.

In <u>Ganias I</u>, the government seized an accountant's computer files pursuant to a search warrant for a criminal investigation of his clients and retained a forensic image of the files, which contained the defendant's personal financial records that were outside of the scope

---

[7]    The government argues that the FBI first brought the message to the attention of the SSA on February 4, 2014, less than two months after receiving the responsive material from Facebook. Government's Post-Hearing Reply [90], p. 7 n. 3.

of the search warrant, for over two and half years before developing probable cause to obtain a second warrant for those records.  755 F.3d at 128–29.  Under those circumstances, the Second Circuit held that the government violated the defendant's Fourth Amendment rights by retaining the records "for an unreasonable amount of time."  Id.,137.

Although defendant acknowledges that Ganias I was overruled *en banc* in United States v. Ganias, 824 F.3d 199 (2d Cir. 2016) ("Ganias II"), he argues that Ganias II "did so based on law enforcement's reasonable reliance on a second warrant obtained specifically for the protractedly retained data, leaving the underlying seizure in Ganias I unreached".  Vogelbaum Affirmation [87], p. 10.  However, even if Ganias I remained good law, such reliance would be misplaced, since the government's discovery of the subject messages occurred within two to three months of receiving the responsive materials from Facebook.  While Gainias I instructs that the "government cannot indefinitely retain evidence for use in future criminal investigations . . . . numerous cases hold that a delay of several months between the seizure of electronic evidence and the *completion* of the government's review of that evidence as to whether it falls within the scope of the warrant is reasonable".  United States v. Filippi, 2015 WL 5789846, *8 (N.D.N.Y. 2015) (emphasis in original).  Moreover, unlike in Ganias I, where the government conceded no exception to the warrant requirement authorized the continued seizure of the defendant's personal financial records (755 F.3d 133 n. 7.), here, for the reasons discussed below, the government permissibly retained the subject messages pursuant to the plain view doctrine.  *See* United States v. Lustyik, 57 F. Supp. 3d 213, 233 (S.D.N.Y. 2014).

### f.     Plain View Doctrine

In explaining how it permissibly seized the subject message, which indisputably fell outside the scope of the search warrant, the government argues that by its terms "agents were

authorized in the first instance to *review* the contents of the defendant's Facebook account", and that "anything the agents came across during that process, which was evidence of criminal activity that agents had probable cause to believe the defendant had engaged in, was subject to the 'plain view' exception to the warrant requirement".  Government's response to defendant's supplemental letter brief [65], pp. 3-4 (emphasis in original).[8]

"The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity."  Illinois v. Andreas, 463 U.S. 765, 771 (1983).  "The plain view doctrine has three elements:  A lawful search must be in progress, the evidence is discovered inadvertently, and it is immediately apparent that the discovered item is evidence of a crime."  United States v. Silva, 714 F. Supp. 693, 694 (S.D.N.Y. 1989).  "The Government has the burden of demonstrating each of these elements of the plain-view exception" by a preponderance on the evidence.  Doane v. United States, 2009 WL 1619642, *11 (S.D.N.Y 2009).  *See* United States v. Russell, 2011 WL 1603379, *3 (E.D.Pa. 2011), aff'd, 604 Fed. App'x 193 (3d Cir. 2015).

Having concluded that the search warrant gave law enforcement the right to search the Facebook materials for evidence of providing material support to terrorists, and there being no indication that the agents had advance knowledge of or an intent to seize evidence of SSI fraud in the Facebook materials, the parties' dispute centers primary on the third factor,

---

[8]    Even assuming that the search warrant was invalid, but that the Leon good faith exception is applicable, the government may still rely on the plain view doctrine.  *See* United States v. Legg, 18 F.3d 240, 245 n.2 (4th Cir.1994) ("the rationale of Leon should apply to render an officer lawfully present for purposes of applying the plain view doctrine");  United States v. Wolfe, 22 F. Supp. 2d 627, 641 n. 3 (E.D. Mich. 1998) ("[a]ssuming *arguendo* that the warrant was invalid as to the search of the residence, but that the Leon decision's good faith exception is applicable, this Court would still find that the officers were lawfully searching the defendant's residence for purposes of the plain view doctrine").

namely whether the incriminating character of the document was "immediately apparent". "It is not necessary that an officer know with certainty that an object seized is or contains evidence of a crime at the moment of seizure; it is enough that there be probable cause to associate the object with criminal activity." United States v. Delva, 13 F. Supp. 3d 269, 276 (S.D.N.Y. 2014). "If . . . the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object - *i.e.*, if its incriminating character is not immediately apparent, - the plain-view doctrine cannot justify its seizure." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993).

Defendant questions the applicability of the plain view doctrine to these circumstances, arguing that "numerous courts have expressed skepticism about the unthinking application of the doctrine to search of digital files". Vogelbam Affirmation [91], p. 9 (*citing* United States v. Carey, 172 F.3d 1268 (10th Cir. 1999)). However, he points to no authority (controlling or otherwise) precluding the applicability of the plain view doctrine to digital searches. Moreover, Carey - the primary case he relies upon for this argument - is readily distinguishable. There, the court suppressed pornographic images that were located during the execution of a search warrant for drug-related evidence located on a computer because the agent admitted that after he found the first image of child pornography, he continued to search for child pornography files for five hours, before resuming his search for drug-related evidence. 172 F.3d at 1270-71, 1273.

Defendant also relies on SA Garver's testimony that he had no reason to believe that defendant's conversations with his father would have anything to do with providing material support to terrorists ([81], pp. 29-30) to argue that it should have been immediately apparent "from reading the first exchange" of the chain of private messages that they were between him

and his father, and the review should have ceased and not extended to the subject exchange that was "halfway" through the message chain.  Vogelbaum Affirmation [87], pp. 6-7. However, notwithstanding any doubts that SA Garver may have had about whether defendant's private communications with his father would relate to providing material support to terrorists, "[i]t would have been metaphysically impossible for [SA Garver] (or any agent) to determine whether [defendant's] communications with his father (or anyone) evidenced material support to terrorism without first reviewing those communications".  Government's Reply Memorandum [90], p. 6.

"Ample case authority sanctions some perusal, generally fairly brief, of documents (seized during an otherwise valid search) in order for the police to perceive the relevance of the documents to crime." United States v. Mannino, 635 F.2d 110, 115 (2d Cir. 1980). *See* United States v. Gomez, 652 F. Supp. 461, 463 n. 2 (E.D.N.Y. 1987) ("the seizure of documents as in 'plain view' is not improper notwithstanding the fact that some perusal is needed for the seizing agents to perceive the relevance of the documents to the crime"). Thus, "[i]n cases where officers are authorized to search only for certain incriminating documents, the inspection of all documents - incriminating and innocent - is inherent in the process of deciding which documents are incriminating and which are not." United States v. Padilla, 986 F. Supp. 163, 170 (S.D.N.Y. 1997).  Here, there is nothing to suggest that the discovery of the subject exchange (which, as presented to me, appears at the top of the page and is manifestly incriminating) could not have been discovered without more than a brief perusal of the

communication chain.[9]  Therefore, I conclude that the subject exchange was permissibly seized in plain view, and recommend that defendant's motion to suppress the Facebook evidence be denied.

### 2.    Motion to Dismiss

Defendant moves to dismiss Counts 2 and 4 of the Indictment as being multiplicitous of Count 1.  Comerford Affirmation [38], ¶¶13-16.  However, in his reply, defendant acknowledges that this motion is premature.  Defendant's Reply [42], pp. 6-7, ¶III. Therefore, I recommend that the motion be denied, without prejudice.

### 3.    Motion for Discovery

Although defendant seeks a variety of discovery pursuant to Rule 16(a)(1) (Comerford Affirmation [38], ¶17), he concedes in his reply that "[t]he Government has provided discovery in compliance with Rule 16".  Defendant's Reply [42], p. 7, ¶IV. Nonetheless, he "continues to seek an expert witness disclosure (if the Government intends to call any expert witnesses)".  Id.  This portion of defendant's motion is granted.  Any remaining disclosures pursuant to Rule16(a)(1)(G) shall occur no later than 30 days before trial, or as otherwise directed by the trial judge.  See United States v. Lino, 2001 WL 8356, *21 (S.D.N.Y. 2001).

---

[9]        As produced to me, the subject exchange was located in a two page chain of communications. [69-2], pp. 3-4 of 4.  At the February 14, 2017 oral argument, defendant's counsel stated that the subject exchange was located in a much longer chain of communications between defendant and his father, but he did not produce the subject message to me in that form. Nevertheless, regardless of the length of the communications, I conclude that the government had the right to conduct a brief perusal of them.

4.        **Motion for a Bill of Particulars**

Rule 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense".  United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).  "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999).  "[T]he burden is upon defendants to show that non-disclosure of the requested particulars would lead to prejudicial surprise at trial or would adversely affect defendants' rights".  United States v. Duarte, 2014 WL 29366, *1 (W.D.N.Y. 2014).

"In deciding a motion for a bill of particulars, the important question is whether the information sought is necessary, not whether it is helpful."  United States v. Conley, 2002 WL 252766, *4 (S.D.N.Y. 2002).  A bill of particulars "should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense".  United States v. Henry, 861 F.Supp. 1190, 1197 (S.D.N.Y. 1994).

The court "has the discretion to deny a bill of particulars if the information sought by defendant is provided in the indictment or in some acceptable alternate form".  United States v. Barnes, 158 F.3d 662, 665 (2d Cir. 1998).  *See* United States v. Messina, 2012 WL 463973, *10 (E.D.N.Y. 2012) ("In determining whether a defendant has shown such necessity, the trial court must examine the totality of the information available to the defendant, including the indictment and general pre-trial discovery").  "Whether to grant a bill of particulars rests within

the sound discretion of the district court."  United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984).

Count 4 of the Indictment [16] alleges that defendant made a false statement on or about December 19, 2013 during an interview with the SSA concerning his continued eligibility for SSI.  Specifically, defendant is alleged to have "falsely stated . . . that, since March 1, 2013, he had not been outside the United States for a calendar month or 30 consecutive calendar days".  Id.  Since "[t]he discovery provided from SSA does not state exactly what [he] was asked, and what he allegedly said or did not say", defendant argues that he "needs this information to prepare for trial".  Comerford Affirmation [38], ¶19.  The government responds that it produced "the script that the SSA claims representative used during the . . . interview" and "a copy of the 'Redetermination Summary,' which memorialized the colloquy that occurred during the December 19 phone redetermination".  Government's Response [39], p. 16, ¶II(E)(2). Defendant replies that the interview "appears to have been transcribed in some form in paperwork maintained by the SSA", but since "these records are partially encoded, the defense is unable to ascertain what, if anything, was transcribed concerning the . . . interview". Defendant's Reply [42], ¶V.  For that reason, he continues to seek "particularization of what exactly [he] said or did not say during the interview", or alternatively "additional discovery that would explain what the various codes in the Social Security records mean and what specifically pertains to the . . . interview".  Id.

I conclude that the discovery provided by the government, when coupled with the Indictment, sufficiently informs defendant of the charge against him by identifying the false statement attributed to him and the circumstances during which that statement was allegedly made.  See United States v. Carey, 152 F.Supp.2d 415, 431 (S.D.N.Y.2001) (denying motion for

bill of particulars as to false statement prosecution under 18 U.S.C. §1001, where the defendant

was provided notice of the allegedly false statements). To the extent that defendant seeks other

information concerning the interview, he has made no effort to identify why that information is

necessary to prepare a defense and without anything before me identifying the specific encoding

he seeks to decipher, I am unable to conclude that any further particularization is warranted.

Therefore, the motion is denied, without prejudice.

     **5.**    **Motion for <u>Brady</u>/<u>Giglio</u> Material**[10]

     Defendant moves for immediate disclosure of <u>Brady</u>/<u>Giglio</u> materials and

identifies a number of specific materials that he contends fall within the ambit of this authority.

Comerford Affirmation [38], ¶¶20-25.  The government acknowledges its continuing duty under

<u>Brady</u> "to produce such material, if and when it is aware of it".  Government's Response [39], p.

17, ¶II(F).  However, it argues that "the <u>Brady</u> doctrine does not cover many of the requests".  <u>Id</u>.

With respect to <u>Brady</u> impeachment material, the government agrees to produce such material

"in accordance with the schedule set by the District Court prior to trial and no later than when the

government produces and delivers the <u>Jencks</u> Act material".  <u>Id</u>., p. 18.  In reply, defendant does

not identify any specific request that he believes falls within <u>Brady</u>, but has not been produced.

     "The government's obligations under <u>Brady</u> . . . are seemingly well-established.

The prosecution has a constitutional duty to disclose evidence favorable to an accused when such

evidence is material to guilt or punishment . . . . This duty covers not only exculpatory material,

but also information that could be used to impeach a key government witness."  <u>United States v.</u>

<u>Coppa</u>, 267 F.3d 132, 135 (2d Cir. 2001) (*citing* <u>Giglio</u>, 405 U.S. at 154).  "[A]s a general rule,

<u>Brady</u> and its progeny do not require immediate disclosure of all exculpatory and impeachment

---

[10]    <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

material upon request by a defendant". Id.,146. "[A]s long as a defendant possesses Brady evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." Id.,144. "[T]he time required for the effective use of a particular item of evidence will depend on the materiality of that evidence . . . as well as the particular circumstances of the case". Id., 146.

Based upon the government's representations, defendant's motion is denied. Consistent with Coppa, the government shall timely disclose Brady and Giglio materials to defendant. *See* United States v. Hill, 2012 WL 912948, *5 (W.D.N.Y. 2012).

### 6.    Motion for Disclosures Pursuant to Fed. R. Evid. 404(b), 608 and 609

Defendant moves for disclosures pursuant to Fed. R. Evid. 404(b), 608 and 609. Comerford Affirmation [38], ¶¶26-32. Fed. R. Evid. 404(b)(2)(A) requires that the government "provide reasonable notice of the general nature of any such [Fed. R. Evid. 404(b)] evidence that [it] intends to introduce at trial . . . and . . . do so before trial – or during trial if the court, for good cause, excuses the lack of pretrial notice". "With respect to the defendant's requests under Rules 608 and 609, the only notice requirement imposed by either applies where a party intends to introduce evidence of a conviction that is more than ten years old. Under such circumstances, Rule 609(b) mandates that 'the proponent [give] to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.' To the extent the government intends to use a conviction more than 10 years old, it must comply with this requirement. The government has no obligation to provide the defendants with notice of any material that will be used to impeach him pursuant to Rule 608 should he elect to testify." United States v. Barnett, 2009 WL 1044559, *2 (W.D.N.Y. 2009).

-31-

The government agrees to make the required disclosures pursuant to Fed. R. Evid. 404(b), 608 and 609 "at the time it is ordered to do so by the trial court". Government's Response [39], p. 19, ¶II(G). I conclude that is sufficient. *See* United States v. Busch, 2014 WL 2435596, *5 (W.D.N.Y. 2014). Therefore, based on the government's representations, this motion is denied, without prejudice.

### 7.    Motion for Early Disclosure of Jencks Act Material

Defendant seeks pretrial production of all Jencks Act material. Comerford Affirmation [38], ¶¶33-35. "Courts in this Circuit have consistently held that district courts lack the power to mandate early production of Jencks Act material." United States v. Morgan, 690 F.Supp.2d 274, 286 (S.D.N.Y. 2010). *See* Coppa, 267 F.3d at 145 (the "Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements"); In re United States, 834 F.2d 283, 287 (2d Cir. 1987) ("as to the district court's order for the production of statements of government witnesses, the Jencks Act controlled, and the district court had no inherent power to modify or amend the provisions of that Act"); United States v. Parris, 2014 WL 2745332, *14 (S.D.N.Y. 2014) ("[t]he Jencks Act provides that the Government must produce prior statements of its witnesses after each has testified at trial and deprives the District Courts of the power to mandate early production of such material"); United States v. Scott, 2015 WL 1525580, *4 (D. Conn. 2015) ("[t]he Second Circuit has consistently held that a district court's 'power to order pretrial disclosure is constrained by the Jencks Act,' and that the district court may not order advance disclosure inconsistent with the Jencks Act itself"). Nonetheless, while reserving its right to withhold certain materials where there is a legitimate concern for the safety of a witness, the government agrees to produce its Jencks Act material consistent with the trial judge's pretrial order. Government's Response [39], pp. 20-2,¶II(H). Defendant agrees that

disclosure pursuant to the pretrial order of the trial judge is sufficient.  Defendant's Reply [42],

p. 8, ¶VII.  Therefore, the motion is denied, without prejudice.

### 8.    Motion for Preservation of Rough Notes

Defendant seeks an order directing the government to preserve notes made by

government witnesses.  Comerford Affirmation [38], ¶37.  In response, the government states

that it "has no objection to the request".  Government's Response [39], p. 21, ¶II(I).  Based upon

the government's representation, the motion is denied.

### 9.    Motion for Leave to File Additional Motions

Defendant reserves his right to make additional motions.  Comerford Affirmation

[38], ¶¶38-40.  In response, the government argues that he must show good cause for any belated

motions.  Government's Response [39], p. 22, ¶II(J). I agree with the government. Therefore, the

motion is denied, without prejudice to the possibility of additional motions in the future, upon a

showing of good cause for why they were not timely asserted.  *See* Rule 12(c)(3).

### B.    Government's Cross-Motion for Reciprocal Discovery

The government cross-moves for reciprocal discovery pursuant to Rule 16(b).

Government's Response, p. 22, ¶II(K).  Defendant represents that he will comply with the

obligations of Rule 16(b).  Defendant's Reply [42], ¶XI.  Based upon that representation, the

motion is denied, without prejudice.

### CONCLUSION

For these reasons, defendant's motions for non-dispositive relief (Comerford

Affirmation [38], ¶¶IV-X) are granted in part and denied in part, and the government's cross-

motion for reciprocal discovery (government's Response [39], ¶II(K), pp. 22-23 of 23) is

granted. I further recommend that defendant's motions to suppress the Facebook evidence (Comerford Affirmation [38], ¶I) and to dismiss the Indictment (id., ¶III) be denied.

Unless otherwise ordered by Judge Skretny, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by March 20, 2017. Any requests for extension of this deadline must be made to Judge Skretny. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(c)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(c)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

Dated:      March 6, 2017

                                        /s/ Jeremiah J. McCarthy
                                        JEREMIAH J. MCCARTHY
                                        United States Magistrate Judge